STATE *EX REL.* HOOVER v. TOWN COUNCIL OF CHESTER.

STATE *EX REL.* GROESCHEL & CO. v. SAME.

1. MANDAMUS—USE OF STATE'S NAME.—Whether a relator, praying a writ of mandamus to compel a town council to issue a liquor license, under the law, can use the name of the State without the consent of the Attorney General, raised, but not determined.

2. IBID.—DISCRETION—ESTOPPEL.—Whether a town council had the right to refuse a liquor license not considered; but the town council having placed their refusal on record upon the ground that they had no power to grant the license prayed for, they would seem to be estopped from now raising as an additional ground that they had the discretionary right of refusal.

3. STATUTES—JOURNALS—EVIDENCE—CASES REVERSED.—Where an original bill and an act duly ratified and approved show on their face that the bill originated in the House of Representatives, received three readings in both houses and the act was duly signed by the president of the Senate and the speaker of the House of Representatives, and approved and signed by the

Governor, and deposited with the Secretary of State, the court cannot look to the journals of the two houses to show that the bill did not originate in the lower house, did not receive three readings in both houses and was not duly ratified, the true rule being that such an act is sufficient evidence that it passed the General Assembly, and it is not competent to impeach such an act by the journals of the houses, or any other evidence, other than evidence of such prerequisites as the organization of the houses, the presence of a quorum and the record of votes upon the journals when so required by the Constitution. State *v.* Platt, 2 S. C., 150, and State *v.* Hagood, 13 *Id.*, 46, overruled.

4. IBID.—TITLE.—Under an act entitled "An act to prohibit the manufacture and sale of intoxicating liquors as a beverage within this State, except as herein provided," a provision declaring that no liquor licenses shall be granted after a date therein named, is sufficiently included in the title.

5. IBID.—CONSTITUTIONAL LAW—LIQUOR LICENSES.—Forbidding licenses to private parties to sell intoxicating liquors is within the power of the General Assembly over the regulation of the liquor traffic; and where a party asks for a mandamus to compel the granting of such a license where a statute has forbidden it, the mandamus will be refused, and thereupon other alleged unconstitutional provisions in the same statute cannot be considered.

These were original applications to this court for writs of mandamus, as stated in the opinion.

*Mr. S. P. Hamilton*, for relators.

*Mr. Townsend*, Attorney General, contra.

May 16, 1893.    The opinion of the court was delivered by

MR. JUSTICE POPE.    The relator by petition, in each of the above entitled proceedings, asks that this court will issue a mandamus to the respondent, requiring that a license shall be granted to the petitioners respectively as liquor dealers in the town of Chester, in this State, from the 2d day of January, 1893, up to and inclusive of the 31st day of December, 1893. Both petitions, being based upon facts identical in character, have been heard together.    The respondent denies the right of each petitioner and traverses some of the allegations of fact. Under such circumstances, by an agreement of counsel for relators and respondent, it was referred to Thomas S. Moorman,

Esq., to take the testimony as to the facts in dispute. The report of such testimony was made to this court.

At the hearing before us the following facts were disclosed: In 1888 (20 Stats., 140), the town council of Chester were authorized by the General Assembly of this State to grant licenses to sell spirituous and intoxicating liquors under certain restrictions and modifications. Under the general laws of this State pertaining to such matters, no license could be given for a longer period than one year and not extending beyond the 31st day of December of any year. On the 2d day of January, 1893, the relators, after a strict compliance with all the require-·ments of the statutes of this State as well with all the ordinances and regulations of the town of Chester, applied for a license as retail liquor dealers to begin on the 2d January, 1893, and ending on the 31st day of December, 1893. The respondent, however, refused to grant a license beyond the 30th day of June, 1893, alleging as the basis for such action on their part that the State had passed an act, approved on the 24th day of December, 1892, whereby all licenses to be granted by any towns or cities in this State should cease and determine on the 30th day of June, 1893, and providing pains and penalties upon all persons who should disregard such legislation, and this refusal of the town of Chester with the above ground therefor was put upon the minutes of such town council. The relators, under protest at every step, paid for and took out licenses until 30th June, 1893, but conceiving they were entitled to licenses up to 31st December, 1893, they have applied to this court, in its original jurisdiction, for the writ of mandamus to force such license from the respondents, and allege that the act of December 24, 1892, was unconstitutional on the following grounds:

1. Because if said town council (of Chester) had any discretionary power to grant or refuse licenses to sell spirituous or intoxicating liquors under the act of 1888, the said town council of Chester never exercised their discretion.

2. Because the act of 1888 and chapter LV. of the General Statutes were not repealed by "an act to prohibit the manufacture and sale of intoxicating liquors as a beverage within this State, except as herein provided," the said last named act

being approved December 24, 1892 [1]—the said last named act being void.

3. That said act never acquired the force of law in this State, because the original bill which was sent from the Senate to the House was altered and changed by Ira B. Jones, speaker of the House of Representatives, at the time or after it passed the House, and amended as he saw fit, when it appears in the journal of the House of date of 23d December, 1892, that no such changes, alterations, or amendments were ever sanctioned or ordered by the House of Representatives.

4. That the original bill substituted for the Roper bill was a bill pure and simple to raise a revenue for the State of South Carolina, and originated in the Senate, contrary to the Constitution of this State.

5. Because the original bill was one whose object was to raise a revenue for the State, and such object was not expressed in its title.

6. Because said bill, not being an amendment to the Roper bill, never received three readings in the House, never became an act, and is void.

7. Because no power was ever given to the legislature by the people of South Carolina to create for the State a monopoly in a lawful mercantile business to the exclusion of her own citizens.

8. Because the act which was enrolled and ratified by the two houses of the General Assembly and approved by the governor was not the bill passed by the two houses.

9. Because section 2 of said act violates section 3 of article III. of the Constitution wherein it clothes the governor of the State, as chairman of the board of control, with power prohibited by said section.

10. Because it was never delegated by the people of South Carolina, in the Constitution of 1868, to the State of South Carolina, to enter into a mercantile business to sell spirituous liquors, and to carry on such business to the exclusion of her own citizens.

11. That no power was ever delegated to appropriate fifty

[1] 21 Stat., 62.

thousand dollars to carry on such business by the State as given in section 18 of said act.

12. That sections 23 and 25 of said act violates the Constitution of the United States.

The attorney general of this State interposed before the hearing, denying the right of petitioners to use the name of the State, when no consent had been given to them therefor. We remark that the point raised by the attorney general is one of serious consequences to the relators, for if it should be determined that only those are entitled to the use of the State's name who have the consent of the attorney general for such purpose, our duty might terminate at an early stage, but, under the peculiar circumstances of these petitions, we have determined to waive the consideration of this objection, neither affirming nor denying the proposition of the attorney general.

Nor will we undertake to canvass the question suggested by the respondent as to the exercise of a discretion by the town council of Chester, under the law, to refuse the application of petitioners for a license. Indeed, we feel that the town council having elected to place their refusal to grant a license to the petitioners upon the ground that the act of the General Assembly of December 24th, 1892, forbade any other license than that granted by them (which ground they placed upon the minutes of the said town council), they are estopped from raising this additional ground of refusal.

We prefer to pass directly and squarely upon such questions only as relate to the claims set up by the relators to have licenses issued to them, without undertaking to consider or decide whether the act of 24th December, 1892, commonly known as the dispensary act, contains other features not applicable to these cases in conflict with the Constitution of this State; and before proceeding to the consideration of these questions, we desire to say that our judgment must be considered as to those issues and none others. A different course on our part would be extra-judicial. The relators assail the constitutionality of the act in question substantially on these grounds:

1. (*a*) That it is an act to raise revenue for the State and

hence should have originated in the House of Representatives, whereas, on the contrary, the relators allege it was first considered in the Senate.   (*b*) That every act should relate to but one subject and that subject must appear in the title thereof. (*c*) That the Constitution requires that a bill before it becomes an act must be read three times on three several days in each house, whereas it is alleged that this act did not receive three readings on three several days in the House of Representatives. (*d*) That the Constitution requires that a bill which has passed each house shall be enrolled and ratified, whereas it is alleged that such bill was not so enrolled and ratified.

2. That the act is fatally defective: (*e*) Because the governor of the State is made one of the board of control as provided for in this act, in violation of the Constitution of the State.   (*f*) Because the act creates a monopoly in the State in the sale of intoxicating liquors, thus violating the Constitution of the State.   (*g*) Because the act in its provisions exceeds the legislative power confided by the State Constitution to the General Assembly.   (*h*) Because no power is vested in the General Assembly by the Constitution to appropriate $50,000 to purchase liquors to be sold by agents of the State.

3. That this act, in sections 23 and 25, violates the Constitution of the United States.

The objections indicated as (*a*), (*c*), and (*d*) will be considered together.   The original bill which has been enrolled and ratified in the Senate-house, as is evidenced by the signatures of the president of the Senate and the speaker of the House of Representatives, and also approved by the governor of the State, and duly deposited thereafter in the office of the secretary of state, shows on its face that it originated in the House of Representatives; received three readings in each house, and was thereafter duly enrolled and ratified. But it is contended by the relators that notwithstanding this due regularity of the enrolled act, yet that the journals of the two houses fail to correspond in every particular with the entries of amendments on the original bill.   Thus is presented for our consideration the question that has given rise to not only much discussion in the courts of the different States of

this Union, but also a contrariety in the decisions by such courts of such question. Nor has our own State Supreme Court been free from either difficulty in its past history.

We feel that this is a proper occasion to place this court fairly and unanimously on record in this matter. There have been two decisions by this court on this subject, and both most unsatisfactory, there having been a strong dissenting opinion in each: Chief Justice Moses in the case of *The State* v. *Platt,* 2 S. C., 150, and the present Chief Justice in the case of *The State* v. *Hagood,* 13 S. C., 46. The latter thus declared (p. 64): "It is an entire mistake to suppose that this rule rests upon the idea, that any peculiar sanctity should be attached to the great seal of the State. The question to be determined in cases of this kind is one of fact: what are the terms which have been used by the legislature in a statute, not what the construction of admitted terms should be, nor whether certain requirements of the Constitution have been complied with, which are questions clearly within the scope of judicial cognizance. If an act as enrolled, signed by the officers of the two houses, with the seal of the State attached, and bearing upon its face the approval of the governor, is not to be regarded as conclusive of the terms it contains, then, indeed, is the question as to what is the written law of the land involved in the greatest uncertainty. If courts can go behind such an act and inquire whether each and every word of it has actually received the assent of the legislature, then the question very naturally occurs, how far can they go, and what kinds of evidence may be resorted to? Are the journals conclusive, or can they, as is said to have been done in one of the Illinois cases (*Turley* v. *County of Logan,* 17 Ill., 151), receive parol evidence, and in recollection of members and by the manuscript notes of the clerk amend the journals and then alter the terms of the enrolled act? If so, then rights which depend upon a statute are held by the most shifting and uncertain terms. * * * But if it should be argued that the journals are to be regarded as conclusive and that no other evidence can be received, then the question very naturally arises, why should the journals, made up, as they are, hastily, amidst the excitement and confusion incident to most

30—39

legislative bodies, by subordinate officers of the two branches of the General Assembly, be entitled to any more credit than the enrolled act reported by committees of the bodies themselves as correctly enrolled and ready for ratification and authenticated by the signatures of the presiding officers?"

This dissent of our Chief Justice was preceded in the same line by the very carefully prepared opinions as found in *Pangborn* v. *Young*, 3 Vroom, 29, and *State* v. *Swift*, 10 Nev., 176. Much satisfaction was derived by the adherents of what may be called the Illinois idea, by which the doors of inquiry are thrown wide open in assailing the absolute verity of a duly enrolled act, by the decision of the United States Supreme Court in the case of *Gardner* v. *The Collector*, 6 Wall., 499, where the court held that when it became necessary to ascertain the date of the approval by the president of an act of Congress, there being no entry of the year of such approval endorsed on the enrolled act deposited in the office of the secretary of state, it was competent to supply such needed information from the journals of the two houses. But since *Gardner* v. *The Collector* was decided, the United States Supreme Court, in a very carefully and ably prepared opinion pronounced by Mr. Justice Harlan, in *Field* v. *Clark*, 143 U. S., 649, have decided that "the signing by the speaker of the House of Representatives and by the president of the Senate, in open session, of an enrolled bill, is an official attestation by the two houses of such bill as one that has passed Congress; and when the bill thus attested receives the approval of the president, and is deposited in the department of state according to law, its authentication, as a bill that has passed Congress, is complete and unimpeachable."

In the case thus cited, care is taken to restrict the meaning of *Gardner* v. *The Collector, supra,* and, in addition, this language occurs: "The signing by the speaker of the House of Representatives and by the president of the Senate, in open session, of an enrolled bill, is an official attestation by the two houses of such bill as one that has passed Congress. It is a declaration by the two houses, through their presiding officers, to the president, that a bill thus attested has received, in due

form, the sanction of the legislative branch of the government, and that it is delivered to him in obedience to the constitutional requirement that all bills which pass Congress shall be presented to him. And when a bill thus attested receives his approval, and is deposited in the public archives, its authentication as a bill that has passed Congress should be deemed complete and unimpeachable. As the president has no authority to approve a bill not passed by Congress, an enrolled act in the custody of the secretary of state, and having the official attestation of the speaker of the House of Representatives, of the president of the Senate, and of the president of the United States, carries on its face a solemn assurance by the legislative and executive departments of the government, charged, respectively, with the duty of enacting and executing the laws, that it was passed by Congress. The respect due to coequal and independent departments requires the judicial department to act upon that assurance, and to accept, as having passed Congress, all bills authenticated in the manner stated, leaving the courts to determine, when the question properly arises, whether the act so authenticated is in conformity with the Constitution. It is admitted that an enrolled act thus authenticated is sufficient evidence of itself, nothing to the contrary appearing upon its face, that it passed Congress.

"But the contention is that it cannot be regarded as a law of the United States if the journal of either house fails to show that it passed in the precise form in which it was signed by the presiding officers of the two houses and approved by the president. It is said that under any other view it becomes possible for the speaker of the House of Representatives and the president of the Senate to impose upon the people as a law a bill that was never passed by Congress. But this possibility is too remote to be considered in the present inquiry. It suggests a deliberate conspiracy, to which the presiding officers, the committees on enrolled bills and the clerks of the two houses must necessarily be parties, all acting with a common purpose to defeat the expression of the popular will in the mode prescribed by the Constitution. Judicial action based upon such a suggestion is forbidden by the respect due to a co-ordinate branch

of the government. The evils that may result from the recognition of the principle that an enrolled act, in the custody of the secretary of state, attested by the signatures of the presiding officers of the two houses of Congress and the approval of the president, is conclusive evidence that it was passed by Congress, according to the forms of the Constitution, would be far less than those that would certainly result from a rule making the validity of congressional enactments depend upon the manner in which the journals of the respective houses are kept by the subordinate officers charged with the duty of keeping them.'' The views of Mr. Justice Harlan on this subject were concurred in by every member of the court. Not only so, but in the recent case of *United States* v. *Ballin,* 144 U. S., 1, *Field* v. *Clark, supra,* was approved.

We have been thus careful to reproduce the language of the two opinions in order that it may be seen how this matter of difference is gradually approaching a solution in accordance with the views we entertain. We should refer to the recent decision in Mississippi (*Ex parte Wren,* 63 Miss., 512), where Mr. Justice Campbell as the organ of the court pronounced a learned and exhaustive opinion, agreeing entirely with the views hereinbefore announced, and which overruled *Brady* v. *West,* 50 Miss., 68, which last case had been decided at variance with the views lately adopted by the Supreme Court of Mississippi. Every one admits that the English rule has unvaryingly upheld the doctrine for which we shall and do contend.

Therefore, however unpleasant it may be to reverse previous decisions of this court, still after full and mature consideration we feel it to be a duty we owe the State that the case of *The State* v. *Platt, supra,* should be and is hereby overruled, and as the case of *The State* v. *Hagood, supra,* was really decided upon the authority of Platt's case, it follows necessarily that the case of Hagood must fall when the foundation upon which it rests is taken away. We announce that the true rule is, that when an act has been duly signed by the presiding officers of the General Assembly, in open session in the senate-house, approved by the governor of the State, and duly deposited in the office of the secretary of state, it is sufficient evidence, nothing

to the contrary appearing upon its face, that it passed the General Assembly, and that it is not competent either by the journals of the two houses, or either of them, or by any other evidence, to impeach such an act. And this being so, it follows that the court is not at liberty to inquire into what the journals of the two houses may show as to the successive steps which may have been taken in the passage of the original bill. It will be observed that this conclusion by no means negatives the power of the court to inquire into those prerequisites fixed by the Constitution, and of which prerequisites the journals of the two houses are required to furnish the evidence. Such, for instance, as the organization of the two houses, the presence of a quorum, the votes of two-thirds of the members by ayes and noes to be entered on the journals in certain cases.

So far as objection (*b*) is concerned, we need say but little, for the meaning of this section of the Constitution has received repeated adjudication at the hands of this court. *Morton, Bliss & Co.* v. *Comptroller General,* 4 S. C., 430; the *Bond Debt Cases,* 12 *Id.,* 200; *Whaley* v. *Gaillard,* 21 *Id.,* 560; *Conner* v. *Railway Company,* 23 *Id.,* 434. In the last case quoted, this court quotes with approval what is said in *San Antonio* v. *Mehaffy,* 96 U. S., 315: "When an act of the legislature expresses in its title the object of the act, the title embraces and expresses any lawful means to achieve the object, thus fulfilling the constitutional injunction that every law shall embrace but one subject, and that shall be expressed in its title." Applying the principles decided by these cases to the act we are now considering, we are unable to see that it does not fully answer the requirements of this section of our Constitution.

Lastly, we consider the subdivisions (*f*), (*g*), and (*h*), and also division numbered 3. As to these several points embodied in these four objections, wherein it is claimed that the act we are now considering is in violation of certain provisions of our Constitution as well as that of the United States, the Constitution in forbidding the granting of licenses to retail only question really involved here is whether said act violates we do not see how such questions can arise in this case. The

spirituous liquors beyond the 30th day of June, 1893, and to that question we have confined our attention, and having reached the conclusion that the said act, being in effect an act to regulate the sale of spirituous liquors, the power to do which is universally recognized, it is quite clear that there is nothing unconstitutional in forbidding the granting of licenses to sell liquors except in the manner prescribed by the act. But whether the act contains other features not affecting the right of relators to the licenses claimed by them is a question that cannot properly arise in these cases, and cannot, therefore, be considered, for, as we have said above, it would be extra-judicial to do so.

It is the judgment of this court, that the prayer of each of the petitioners be denied, and the petitions for mandamus be dismissed.