15676

BRAILSFORD v. WALKER, MAYOR, *ET AL.*
(31 S. E. (2d), 385)

*Mr. Huger Sinkler,* of Charleston, S. C., Counsel for Petitioner,

*Mr. Hugo S. Sims,* of Orangeburg, S. C., Counsel for Respondents,

September 7, 1944.

MR. ASSOCIATE JUSTICE OXNER delivered the unanimous Opinion of the Court:

The petitioner, a resident freeholder and taxpayer of the City of Orangeburg, State of South Carolina, by permission, instituted this proceeding in the original jurisdiction of this

Court for the purpose of enjoining respondents from issuing

and selling bonds of the City of Orangeburg in the sum of $210,000.00, the proceeds of which are to be used for the following purposes: (1) $144,000.00 to retire indebtedness heretofore incurred in constructing, extending, and improving certain streets and sidewalks, and in improving and extending the water and sewerage systems of said City; (2) $40,000.00 to retire indebtedness heretofore incurred in the purchase of a site for an airport; (3) and the balance, amounting to approximately $26,000.00, for the acquisition of additional municipal airport facilities. The past indebtedness above described, amounting to $184,000.00, is now evidenced by promissory notes of the City which are held by several banking institutions. While styled notes, it is conceded that these obligations are governed by the applicable constitutional provisions relating to the incurring of bonded indebtedness by a municipal corporation. None of the requirements of Section 7, Article 8, of the Constitution were observed in the issuance of these notes, although it is conceded that the City has received full benefit from the funds so borrowed.

We shall briefly state the circumstances leading up to the proposal to issue these bonds. Finding that the bonded debt limitation contained in Section 7, Article 8, of the Constitution constituted a barrier to essential municipal improvements, the City of Orangeburg, like many other municipalities, sought by special constitutional amendment to alleviate the rigor of the eight per cent. debt limitation. Accordingly, in 1919 a special constitutional amendment relating to the City of Orangeburg was proposed and adopted which removed the limitation when the proceeds of such bonds were applied "exclusively for the building, erecting, establishing, repairing, extending or maintaining of sidewalks, streets, waterworks, lighting plants, sewerage system, fire department or City Hall and Guardhouse for such city, or for any or either of such purposes, or for the payment of any indebt-

edness already incurred for any or either of such purposes."
31 St. at Large, p. 124.

In 1942 the assessed value of the taxable prope:ty of the
City of Orangeburg under the normal eight per cent. bonded
debt limitation, only permitted a bonded debt of approxi-
mately $170,000.00. There existed at that time a floating in-
debtedness, hereinbefore described, of $184,000.00, of which
the item of $40,000.00, incurred in the purchase of an air-
port site, did not come within the purposes enumerated in
the constitutional amendment of 1919. There also arose
some doubt as to whether the words "already incurred" in
the 1919 amendment referred only to indebtedness existing
when the 1919 amendment was submitted. A still further
question arose as to whether an airport was a purpose for
which a municipality could lawfully expend municipal funds.
In order to remove all these questions and thereby permit
the City to fund its present indebtedness in full and acquire
additional facilities for its airport, a further special amend-
ment to Section 7, Article 8, of the Constitution was pro-
posed and a joint resolution submitting same to the electo-
rate was passed during the 1942 session of the General As-
sembly, 42 St. at Large, page 2465. During the same ses-
sion of the General Assembly an act was passed validating
the floating indebtedness of the City. In this act the General
Assembly finds that the City of Orangeburg has been en-
riched to the extent of this indebtedness and that the same
has been used for purposes germane to the corporate func-
tions of said municipality. 42 St. at Large, page 2467. The
proposed constitutional amendment was submitted to the
electorate at the general election held in November, 1942,
and overwhelmingly approved. At the special session of the
General Assembly, held in 1944, it purported to pass an act
ratifying this amendment. Act No. 808 of the Acts of 1944,
43 St. at Large, page 2321. For convenience, it will be here-
inafter referred to as the 1944 amendment. It purports to
further remove the limitations contained in Section 7, Ar-

ticle 8, and Section 5, Article 10, of the Constitution by excluding bonded indebtedness incurred for airports, and other projects not germane to this controversy, from said limitations.

The City claims that by reason of this 1944 constitutional amendment the normal constitutional limitations on the bonded indebtedness of municipalities do not apply to the proposed bond issue in controversy. Petitioner denies the validity of said amendment, contending that no ratifying act was ever properly enacted and that the effort to do so at the 1944 session of the General Assembly was ineffectual in that there was a failure by the General Assembly to comply with Section 1, Article 16, of the Constitution. A further question arises as to how the constitutional provision relating to the City of Orangeburg, as amended, reads, in the event it is held that the amendment was properly ratified. Petitioner further raises several questions involving the construction of said amendment.

We shall first determine whether the amendment was properly ratified. It is conceded that all constitutional requirements were observed in the passage of the joint resolution submitting the amendment and that the amendment was regularly approved by the electorate. Petitioner seeks to show by the journal of the House of Representatives that the bill ratifying the amendment received only one reading in its final form in that body. The journal entries show that the bill as first introduced in the House of Representatives related to the repeal of a section of the Code regulating primary elections. This bill received three readings on three separate days, was amended in a particular not germane to this controversy, and sent to the Senate. Thereafter, the House recalled the bill from the Senate and the vote whereby it was read for the third time reconsidered. Thereupon the bill was amended by substituting a bill ratifying the amendment in question and on the question of the passage on third read-

ing of the original bill, as thus amended, the yeas and nays were taken as required by the Constitution, resulting in 94 votes in favor of the passage of .the bill as thus amended and none against its passage. The bill was then sent to the Senate where it received three readings on three separate days and was passed with due observance of all constitutional requirements. The bill was thereafter regularly ratified, approved by the Governor and is now a duly enrolled act in the records of the Secretary of State.

This Court adopted the "enrolled bill" rule in *State ex rel. Hoover v. Town Council of Chester,* 39 S. C., 307, 17 S. E., 752, and has consistently adhered to it in subsequent decisions. Many of these decisions are discussed and reviewed in the case of *State ex rel. Coleman v. Lewis et al.,* 181 S. C., 10, 186 S. E., 625. In adopting the "enrolled bill" rule in the *Hoover case,* the Court stated that "this conclusion by no .means negatives the power of the court to inquire into those prerequisites fixed by the constitution, and of which prerequisites the journals of the two houses are required to furnish the evidence." [39 S. C., 307, 17 S. E., 755.] It is proper, therefore, to inquire as to what prerequisites are fixed by the Constitution of which the journals are required to furnish the evidence.

The Court held in *Wingfield v. South Carolina Tax Commission,* 147 S. C., 116, 144 S. E., 846, that the Constitution does not specifically require that the journals shall show the number of times and days that a bill has been read in either or both Houses; in *Thompson v. Livingston, Mayor,* 116 S. C., 412, 107 S. E., 581, that the Constitution does not require a yea and nay vote to be taken on each reading of a joint resolution or a ratifying bill; and in *Lucas v. Barringer, Mayor, et al.,* 120 S. C., 68, 112 S. E., 746, 751, that in the passage of a joint resolution submitting a constitutional amendment, "Article 16, § 1, of the Constitution does not require more than one entry on each journal."

In the case of *Thompson v. Livingston, Mayor, supra,* in distinguishing between the journal entries required by Section 1, Article 16, of the Constitution in the case of a joint resolution submitting an amendment and those required in the case of a ratifying act, the Court said [116 S. C., 412, 107 S. E., 583] : "Petitioner, in his objections, has regarded the requirements of the Constitution as to journal entries, to be the same both on the passage of the proposed amendment and bill ratifying the same. This is erroneous, as the Constitution provides for journal entries of the yea and nay vote only on the passage of the proposed amendment, and the passage of the ratifying act provides only for the taking of yea and nay vote, without requiring a journal entry."

The Court applied the "enrolled bill" rule in the cases of *Lucas v. Barringer, Mayor, supra,* and *Stevenson et al. v. Carrison, Mayor, et al.,* 122 S. C., 212, 115 S. E., 251, on the question of whether a joint resolution received three readings in each branch of the General Assembly. The instant case is much stronger than the two cases just referred to, as here we are considering only the constitutional requirements as to a ratifying bill and not those as to a joint resolution. The petitioner contends that these two decisions, in so far as they hold that the "enrolled bill" rule applies to joint resolutions and acts ratifying same, have been modified by the later decision of this Court in the case of *Weeks v. Ruff et al.,* 164 S. C., 398, 162 S. E., 450. We do not think so. In the *Weeks case* the question arose as to whether an amendment made in the Senate to a joint resolution which had been introduced in and passed by the House, created such a radical change as to require the adoption of the Senate amendment in the House by a two-thirds yea and nay vote. The question there involved is unrelated to the one now presented.

It is conceded in the instant case that the ratifying bill in its final form received the necessary majority in both branches of the General Assembly by a yea

and nay vote taken thereon. The only omission complained of is the failure of the ratifying bill to receive three readings in the House and upon that question clearly the "enrolled bill" rule applies. The certificate of the Secretary of State shows that the ratifying act received three readings on as many days in each branch of the General Assembly, as evidenced by the signatures of the President of the Senate and Speaker of the House; and under the "enrolled bill" rule, we are not at liberty to inquire into what the journal may show as to the successive steps which may have been taken in the passage of the original bill.

Having concluded that the 1944 constitutional amendment was properly adopted, the next question is in what particular did this amendment change the 1919 constitutional amendment relating to the City of Orangeburg? In other words, how does this constitutional provision, as now amended, read? The contentions of the parties can be better explained by first quoting the contention of respondents as to how it should read and in doing so, we have enclosed certain parts in parentheses and italicized another portion for reasons which will later appear. Respondents contend that the amendment as it now stands is as follows: "Provided, That the limitations imposed by this Section, and Section 5, of Article X, of the Constitution of the State of South Carolina, shall not apply to the bonded indebtedness of the City of Orangeburg when the proceeds of such bonds are applied exclusively for the building, erecting, establishing (purchasing, developing, improving), repairing, extending or maintaining of sidewalks, streets, waterworks, lighting plants, sewerage system, fire department or city hall and guardhouse for such city (parks, playgrounds, airports, real estate and municipal buildings), or for any or either of such purposes, *or for the payment of any indebtedness already incurred for any or either of such purposes,* and when the question of incurring such bonded indebtedness is submitted to the qualified electors of such municipality by the City Coun-

cil of said city and a majority of those voting in such election or elections shall vote in favor thereof."

In the joint resolution proposing the 1944 amendment, that part which declares what amendments are to be made states that the 1919 amendment is to be amended by adding and inserting in their appropriate places the words which we have set out in parentheses. It does not provide for the striking out of any portion of the 1919 amendment. That part of the resolution which undertakes to set out how the provision will read, "when amended," is exactly as hereinabove quoted except the portion italicized is omitted. It, therefore, appears that there is a conflict between the amending part of the resolution and the part which states how the provision shall read "when amended." The same conflict appears in the ratifying act. Stated differently, are the words in italics now properly a part of the constitutional provision relating to the City of Orangeburg; or by omitting these in stating how the constitutional provision should read, when amended, are they now eliminated from the constitutional provision? To which part must we look to find the legislative intent?

In *Bush v. Western Union Telegraph Co.*, 93 S. C., 176, 76 S. E., 197, 199, the Court held that ordinarily the act as it would read "when amended" would control in case of conflict. But the Court further stated that no hard and fast rule could be laid down and that some circumstances "might lead to the conclusion that the legislative will is to be found in the amending part of the act. If so, of course, that must control, for it is the intention only which we seek."

In the case of *Duncan v. Record Publishing Co. et al.*, 145 S. C., 196, 143 S. E., 31, the same question arose where there was involved a conflict in the two parts of a joint resolution submitting a constitutional amendment. The Court again held that the cardinal question was the legislative intention of the people in voting upon the constitutional amendment. It was there held that the part of the resolution de-

claring what amendments were to be made correctly expressed such intention and, therefore, it controlled.

Bearing this principle in mind, we now undertake to ascertain the legislative intention in this instance. When the joint resolution submitting this amendment was passed in the General Assembly, there also passed about the same time an act validating, as far as the General Assembly was empowered to do so, the floating indebtedness of the City of Orangeburg. The desire of the City to fund its floating indebtedness and the desire to remove any question with reference to the airport being a corporate purpose germane to the functions of such municipality were the primary factors inducing the proposal to further amend the constitutional provision relating to said City. The passing of the validating act shows that these circumstances were known at the time to the General Assembly. To hold that the words in italics were intentionally eliminated from the 1919 amendment would thwart the obvious purpose in offering the 1944 amendment. We think it is clear that there was a legislative intent that the City should be permitted to fund the floating indebtedness which existed in 1942 and to incur any further necessary indebtedness for the purposes set out in the 1944 amendment. We are strengthened in this conclusion by the form of the ballot which the joint resolution prescribed for submission of the issue to the electorate. The proposed amendment is described in the ballot in exactly the same language as that used in that pa t of the resolution where it was declared what amendments were to be made. In other words, the form of the ballot describes what words are to be added and makes no reference to the elimination of the words in italics. It was, therefore, certainly not within the contemplation of the electorate that these words would be eliminated. Under the case of *Heinitsh v. Floyd, Mayor, et al.,* 130 S. C., 434, 126 S. E., 336, this fact is entitled to great weight in determining the intention on the part of the

General Assembly and the people in adopting this amendment.

We, therefore, conclude that after incorporating the 1944 amendment, the provision relating to the City of Orangeburg now reads as hereinabove quoted. There remain for consideration the questions raised concerning the proper construction to be given such amendment.

Petitioner contends that the 1944 amendment would not permit the City to fund its floating indebtedness without regard to the eight per cent. limitation. He asserts that the clause "for the payment of any indebtedness already incurred for any or either of such purposes" restricts such refunding to indebtedness already incurred when the 1919 amendment was adopted and relies on the case of *Lucas v. City of Florence et al.,* 103 S. C., 169, 87 S. E., 996. In construing a constitutional provision relating to the City of Florence containing a similar expression, the Court there held that the words "already incurred" referred only to indebtedness existing when the amendment was adopted. However, the Court was again called upon to construe this identical constitutional amendment in *Lucas v. Barringer, Mayor, et al., supra,* 120 S. C., 68, 112 S. E., 746, and in holding that the City of Florence could refund any indebtedness already incurred, said: "The purpose for which these bonds are issued is for paying off and liquidating all outstanding open indebtedness due by the city. The language of the amendment is 'payment of debts already incurred.' 'Outstanding open indebtedness' is synonymous with 'debts already incurred,' and likewise with 'past indebtedness,' and therefore comes under the ruling in *Clinkscales v. Fant* [*infra*]."

In the *Clinkscales case,* 116 S. C., 206, 107 S. E., 515, the Court was called upon to define "past indebtedness" when used in a constitutional provision exempting the City of Anderson from the eight per cent. debt limitation. The Court held that "past indebtedness" referred to all indebtedness

existing at the time of the filing of the petition for an election on the issuance of bonds, irrespective of whether such indebtedness was created before or after the adoption of the amendment and that such words did not refer merely to indebtedness existing at the time of the adoption of the amendment.

■ We do not find it necessary to pass upon the seeming conflict in the decisions just alluded to; nor do we undertake to determine whether the words "already incurred" would ordinarily restrict the funding to indebtedness existing when the constitutional amendment was adopted. In any event, we think it is clear that the words "already incurred" as they now appear in the constitutional provision under consideration would include any indebtedness existing at the time of the submission of said 1944 amendment to the electorate, which is the indebtedness now sought to be refunded. To hold that the amendment as it now stands refers only to indebtedness already incurred in 1919 would do violence to its language and defeat the underlying purpose of the 1944 amendment.

■ The petitioner further contends that the notes representing this floating indebtedness are invalid and that refunding same would not constitute a corporate purpose for which the City may issue bonds. Petitioner asserts that these notes were issued without the observance of the requirements of Section 7, Article 8, of the Constitution, and that prior to the adoption of the 1944 amendment the City had no power to incur indebtedness for an airport. Conceding the invalidity of these notes upon the grounds stated, the City is now empowered by the 1944 amendment to issue bonds for these purposes and to fund any indebtedness already incurred for such purposes. The case of *Lucas v. City of Florence et al., supra,* 103 S. C., 169, 87 S. E., 996, decides this issue adversely to the contention of petitioner. Also see *Robinson v. Askew et al.,* 129 S. C., 188, 123 S. E., 822.

The fifth and last question stated in the argument of counsel is whether an airport is a corporate purpose for which a municipality may issue bonds, in the absence of a specific amendment to the Constitution empowering such municipality to do so. In view of the fact that the 1944 amendment specifically authorizes the City of Orangeburg to issue bonds for the purpose of establishing and maintaining an airport, it is unnecessary to pass upon this question and we intimate no opinion thereabout.

For the foregoing reasons, the return to the rule to show cause by respondents is deemed sufficient; the injunction prayed for is denied and petition dismissed.

MR. CHIEF JUSTICE BAKER and MESSRS. ASSOCIATE JUSTICES FISHBURNE, STUKES and TAYLOR concur.