Order of Judge Lewis follows:
This matter comes before me on motion of the plaintiff to overrule the demurrer to his complaint.
The plaintiff is a resident and taxpayer of Hartsville School District No. 32, of Darlington County, the State of South Carolina. The defendants constitute the Board of Trustees of said School District. *Page 227 
The issue here requires the determination of a constitutional question, novel in this jurisdiction. It is the question of whether it is required that there be presented to the Governor, in the manner contemplated by Section 23, Article IV, of the Constitution, Joint Resolutions adopted by the General Assembly pursuant to Section 1 of Article XVI, proposing amendments to the Constitution of the State.
The 1948 session of the General Assembly adjournedsine die on Thursday, April 15th 1948. On that date, three Joint Resolutions, each proposing Amendments to the Constitution, were duly enrolled, ratified, and signed by the President of the Senate and Speaker of the House of Representatives. Each of these contained proposals that Section 5 of Article X of the Constitution be amended by enlarging the then existing debt limits of three school districts (See Permanent Senate Journal for 1948, pages 1473, 1479 and 1481). The Joint Resolution, which is concerned in this litigation, 45 Stat. at Large, page 2586, proposed that the original provisions of Section 5, Article X, imposing a limit on Hartsville School District No. 32 be stricken therefrom and in lieu of the original provisions that said School District be authorized to issue bonds to an amount not exceeding fifteen per centum (15%) of the assessed value of all taxable property therein. Section 3 of the Joint Resolution provided that the Resolution should take effect upon its approval by the Governor.
It appears that after the original Joint Resolution was enrolled and ratified by the action of the two Houses, and signed by the President of the Senate and Speaker of the House, it was delivered on the same day by the Clerk of the Senate to the Governor, in accordance with Rule 7 of the Joint Rules of the Senate and House. Thereafter, the Governor wrote across the cover of the Joint Resolution:
"Amendment to Constitution — Governor's Signature not required. J. Strom Thurmond, April 17, 1948." *Page 228 
Governor Thurmond's action in respect to this Resolution was similar to his action on every Joint Resolution proposing amendments to the Constitution that were adopted by the General Assembly during his term of office. But in all cases, except with respect to the three Resolutions enrolled on this particular day (April 15th, 1948), his failure to return them to the House in which they originated within the time limit prescribed by Section 23 of Article IV, had the same effect upon these other Joint Resolutions, as though he had signed them. Cf. Goree v. Greenwood County Supervisor,93 S.C. 312, 76 S.E. 705.
Notwithstanding the fact that the Governor failed to approve the Joint Resolution, the Secretary of State submitted the question proposed by the Joint Resolution in the General Election held on November 2d 1948, on which occasion the same was approved by a vote of 3,392 to 605. During its 1949 session, the General Assembly ratified the proposed amendment as a part of the State Constitution.
The Governor's action in refusing to approve this Joint Resolution squarely raises the question of whether his approval was necessary, for it is seen from the foregoing recitation of facts that the General Assembly's adjournment on the day that the Joint Resolution was presented to him prevented the running of the three-day period provided for in Section 23, Article IV of the Constitution. His action also raises the subordinate question as to whether this particular Resolution became effective in time to justify the submission of the question at the 1948 Election, notwithstanding that it might be unnecessary for the Governor to sign Resolutions of this sort, because by its own terms it provided that it should not take effect until it had been signed by the Governor. If the answer to this question be the negative, then the Joint Resolution did not finally become effective until two days following the convening of the 1949 General Assembly, to wit, on January 13th, 1949, with the result that the proposal submitted at the election held in November, 1948." *Page 229 
was prematurely submitted. I shall discuss these questions in the order presented.
 Question 1
Do Joint Resolutions proposing Amendments to the Constitution of this State and agreed to by two-thirds of the members elected to each House fall within the purview of Section 23, Article IV of the Constitution, which provides that "Every Bill or Joint Resolution which shall have passed the General Assembly, except on a question of adjournment, shall, before it becomes a Law, be presented to the Governor * * *."
It is, of course, a recognized principle of American constitutional law that questions relating to the Constitution of the several States must be interpreted by the Courts of each State.
"The conformity with the State Constitution of the proceedings in the enactment of the law is a question for the determination of the State Court and its judgment is final."Smith, Rec'r. v. Jennings, 206 U.S. 276, 27 S.Ct. 610,611, 51 L.Ed. 1061.
For this reason, decisions of other courts interpreting questions arising under the Constitution of their respective States are interesting and, perhaps, persuasive, but they are not controlling. Consequently, it occurred to me that I should first examine this question from the standpoint of the present Constitution of South Carolina, and former Constitutions of this State, and decide the question, if possible, by reference to those documents, and afterwards determine if my views found support in the Courts of other jurisdictions. With that in mind, I have examined not only the provisions of our present Constitution, but I have referred also to our former Constitutions.
Since its disavowance of allegiance to the British Crown, South Carolina has had five Constitutions. The first is that adopted by the Congress held in Charleston over the period beginning November 1st, 1775, and ending March 26th, *Page 230 
1776. This document is referred to as the "Constitution of South Carolina, 26th of March, 1776". Two matters, of interest to this question, appear in this document.
In the first place, there is no provision in the document for its amendment. In this respect, the document is statutory in nature, for its alteration could take place by subsequent statutory enactments. Just such an alteration did take place with the enactment of March 19, 1778, which was the Act of the General Assembly establishing the Constitution of 1778.
A second matter of interest in the 1776 document is the provision of Article VII, which vested the legislative authority of the Colony, as this State was referred to in that document, in the President (of the Colony), the General Assembly (a body comparable to the present House of Representatives) and the Legislative Council (a body whose modern counterpart with enlarged powers is the Senate). Article VIII provided that all bills must be presented to the President and that they would not become law without his assent.
The Constitution established in 1778 vested the legislative authority in a General Assembly to consist of two distinct bodies, a Senate and a House of Representatives. It thus removed the veto power which existed under the Constitution of 1776. It also provided that the document itself might not be amended without 90 days notice and unless a majority of the members of the House of Representatives and the Senate consent. The Constitution of 1778 remained in force until that adopted in 1790, which, because of the fact that it is our first Constitution adopted subsequent to the adoption of the Constitution of the United States and afterwards remained in effect for 78 years, makes it a document of considerable significance. Under this document there was no power of veto, the applicable Section providing merely that Bills and Ordinances should have the force of law when the same had been read three times on three several days in each House, had the Great Seal affixed to it, and had been *Page 231 
signed in the Senate House by the President of the Senate and the Speaker of the House of Representatives (Section 16, Article I). Article XI provided for the amendment of the Constitution and because there exists a significant difference between this provision and those appearing in the Constitutions of 1868 and 1895, I shall make reference to it. It states, in part:
"No part of this constitution shall be altered, unless a bill to alter the same shall have been read three times in the house of representatives, and three times in the senate, and agreed to by two-thirds of both branches of the whole representation * * *."
I shall later emphasize that those writing this document contemplated that the vehicle proposing amendments to it be in the form of a Bill.
The Constitution of 1868 restored the veto power of the State's Chief Executive. Section 22, Article III. The provisions of this Section are, for the purposes of this discussion, substantially identical to the provisions now appearing in the present Constitution and found therein as Section 23 of Article IV. The veto power in both documents provides that,
"Every Bill or Joint Resolution which shall have passed the General Assembly, except on the question of adjournment, shall, before it becomes a law, be presented to the Governor."
The Constitution of 1868 contained provisions permitting its amendment. Article XV of that document prescribes the way in which the Constitution is to be amended, and while, once again, minor differences exist between the provisions of the Constitution of 1868, dealing with the amendment of that document, and those found in the Constitution of 1895, as Article XVI, for the purpose of this discussion, the provisions may be deemed identical.
The provisions of the two Constitutions dealing with the manner of proposing amendments, provide: *Page 232 
"That any amendment or amendments to this Constitution may be proposed in the Senate or the House of Representatives if the same be agreed to by two-thirds of the members elected to each House, such amendment or amendments shall be entered on the Journals respectively, with the yeas and nays taken thereon; and the same shall be submitted to the qualified electors of the State, at the next general election thereafter for Representatives * * *."
Some twelve amendments were made to the Constitution of 1868. An examination of the Statutes at Large of South Carolina for the applicable years shows that in every instance the amendments were proposed by Joint Resolutions. Apparently, each was presented to the Governor for in every instance there appears a notation that the same was approved. Countless amendments have been proposed to the Constitution of 1895, and from an examination of the legislative action taken in proposing these amendments, it seems that the Joint Resolution has invariably been the vehicle used by the General Assembly. In every instance, they were submitted to the Governor for his approval and most of them contain a provision similar to that found in Section 3 of this Resolution, providing that the Joint Resolution should take effect upon its approval by the Governor. In at least one instance, the Governor has undertaken to veto a Joint Resolution. In 1938, the General Assembly, by Joint Resolution, proposed to amend the Constitution to provide for the retirement of Judges of the Supreme Court and Circuit Courts. This Resolution was delivered to Governor Johnston on May 9th, 1938, and he vetoed it subsequent to the adjournment of the General Assembly on July 23, 1938. Notwithstanding his veto, the question proposed was submitted in the election held in November of that year, but failed to carry. When it was returned to the House of Representatives, from whence it originated, the Speaker ruled the matter of the veto out of order because of the fact that the proposal had failed to carry in the election. *Page 233 
It has been strongly argued to me, that this course of conduct on the part of the General Assembly, in submitting Joint Resolutions proposing Amendments, to the Executive, since the restoration of the veto power by the 1868 Constitution, requires the Court to construe Section 1 of Article XVI, and Section 23 of Article IV in such a way as to harmonize the two. It has been urged that the long-standing precedent, followed by each General Assembly, for a period of nearly 90 years, and the acquiescence therein by all of the State's Chief Executives, except the present incumbent, establishes a persuasive, if not a binding precedent. I recognize that the Courts, where possible, will adopt a construction of a constitutional provision in keeping with the construction given to the provision by the coordinate branches of the Government. But such constructions are not controlling. In the last resort, the Constitution must be interpreted by the Court. Gentry v. Taylor, 192 S.C. 145,5 S.E.2d 857. For this reason, I do not consider the precedent of these many years controlling.
My attention has also been directed to decisions of our Court declaring that Joint Resolutions, proposing amendments to the Constitution, were subject in certain respects to the Enrolled Bill Rule. For example, there is the case ofLucas v. Barringer, 120 S.C. 68, 112 S.E. 746, 750, in which the following appears:
"The plaintiff had introduced in evidence, over objection of defendants, the whole Senate and House Journals for 1918, and attempted to show that the joint resolution had not received three readings in either the Senate or House, and on the third reading in the Senate it had not been entered in the journal in form as amended, and that the journal entries were not in accordance with the requirements of article 16, § 1 of the Constitution. The defendants objected to any further examination of the Journals being made, inasmuch as they had shown that the joint resolution had been entered once on both the Senate and House Journals with *Page 234 
the yea and nay votes thereon, and this one entry fulfilled the constitutional requirements, and, as the certificate of the Secretary of State attached to the copy of the joint resolution certified that it had been read three times on three several days in each house of the General Assembly, duly ratified and signed by the President of the Senate and Speaker of the House of Representatives, approved by the Governor and the great seal of the state impressed thereon, the court was not at liberty to inquire further into what the journals of the two houses may show as to the successive steps which may have been taken in the passage of the original joint resolution.
"I sustained the objection and would not allow the introduction of the balance of the journals, and did so under the ruling in the case of State ex rel. Hoover v. Town Councilof Chester, 39 S.C. 307, 17 S.E. 752, and Graham v.Ervin, 114 S.C. 419, 103 S.E. 750."
Similar indications that a Joint Resolution proposing an amendment to the Constitution was subject to certain phases of the Enrolled Bill Rule appear in Stevenson v. Carrison,122 S.C. 212, 115 S.E. 251, and Fleming v. Royall,145 S.C. 438, 143 S.E. 162, 167.
The doctrine of the Enrolled Bill Rule was established in this State by the decision of our Supreme Court in the case of State ex rel. Hoover v. Chester, supra, a decision which overruled earlier decisions of our Court, approving the examination of the original Journals of the Houses to determine the contents of Statutes. The definition of the Enrolled Bill Rule given in the case of State ex rel. Hooverv. Chester, supra, has been frequently quoted as follows [39 S.C. 307, 17 S.E. 755]:
"We announce that the true rule is that, when an act has been duly signed by the presiding officers of the general assembly, in open session in the senate and house, approved by the governor of the state, and duly deposited in the office of the secretary of the state, it is sufficient evidence, nothing *Page 235 
to the contrary appearing upon its face, that it passed the general assembly, and that it is not competent either by the journals of the two houses, or either of them, or by any other evidence, to impeach such an act. And, this being so, it follows that the court is not at liberty to inquire into what the journals of the two houses may show as to the successive steps which may have been taken in the passage of the original bill."
From a casual reading of the foregoing, it would seem that the Governor's signature upon an Act is one of the essentials to the application of the doctrine. However, such cannot be the case because the Enrolled Bill Rule has been applied to vetoed bills. Cf. State ex rel.Coleman v. Lewis, 181 S.C. 10, 186 S.E. 625, and because of this, I have concluded that the Governor's signature is not one of the essentials of the Enrolled Rule Bill. For this reason, references to the necessity of the Governor's signature upon Joint Resolutions proposing amendments to the Constitution, in order to bring them within the Enrolled Bill Rule, are of no real significance.
When those writing Article XV of the Constitution of 1868 and its present counterpart, Article XVI of the Constitution of 1895, omitted therefrom any descriptive reference to the nature of the legislative vehicle to be used in proposing an amendment, it was done advisedly and with full knowledge of the fact that under the Constitution of 1790, the legislative vehicle to purpose the amendment had been specifically designated as a Bill. I have already pointed out that under the Constitution of 1790, Executive assent or approval to legislative Acts was not required. However, with the restoration of the veto, Executive assent or approval, except on matters of adjournment, was required to every Bill or Joint Resolution. Bills and Joint Resolutions are the accepted style of legislative enactments. Consequently, the omission of any designation of the proposing legislative vehicle is highly significant and must mean that those writing the provisions of our last two Constitutions *Page 236 
dealing with their amending intended that the Executive should take no part in the amending process.
It was held in the case of Fleming v. Royall, supra, that a Title to a Joint Resolution proposing a constitutional amendment was not essential. And, in that case, the Court pointed out that in many respects the Legislature in proposing constitutional amendments is not subject to rules controlling ordinary legislative action. Now, the Constitution provides that every Act or Resolution having the force of law shall relate but to one subject, and that shall be expressed in the Title. Section 17, Article III. Consequently, in reaching the conclusion which it did in the Fleming case,supra, the Court recognized the principle, that legislative action in proposing amendments to the Constitution did not fall within the purview of Acts or Joint Resolutions, as those documents are contemplated by other provisions of the Constitution.
For the foregoing reasons, I am satisfied that notwithstanding its designation as a "Joint Resolution", the legislative vehicle here was not a Joint Resolution of the sort referred to in either Section 23, Article IV, or Section 17, Article 3, and that, consequently, the Governor's action on the matter was completely unnecessary.
A still further and compelling reason leads me to this conclusion. In order for legislative vehicles, proposing joint resolutions, to become effective, they must be voted upon favorably by two-thirds of the members elected to each House. This means that 83 members of the House of Representatives must vote favorably upon the proposing vehicle, and, at present, 31 members of the Senate. On the other hand, vetoes may be overridden by two-thirds of a quorum.
In Smith v. Jennings, supra, it was specifically held that under the Constitution of 1895 2/3 of a quorum may override a veto. This decision cites other South Carolina judicial precedents dealing with the comparable provision of the Constitution of 1868. Now, a quorum of each House is a mere majority. Section 11, Article III. Consequently, it is *Page 237 
to be seen that even if the Governor's approval was necessary, his action could be overriden by as few as 43 members of the House (2/3 of 63) and 11 Senators (2/3 of 16). Such a result would be wholly illogical. Accordingly, I conclude, and so hold, that the Governor is not a part of the legislative machinery contemplated by Section 1 of Article XVI.
Counsel for the defendants call my attention to the fact that my ruling here is in keeping with an opinion of the Attorney General of the State. While the opinions of the Attorney General are not binding upon the Court, they are persuasive, for that official occupies a quasi judicial position and it is gratifying to find that my views are in harmony with his opinion.
As previously pointed out, there is an absence of judicial precedent on this question in this State. However, similar questions have been presented to other Courts in several other jurisdictions, including the Supreme Court of the United States. In every instance that I have found, with but one possible exception, the results reached sustain my views.
During the course of the argument before the United States Supreme Court in the case of Hollingsworth v.Virginia, 3 Dall. 378, 1 L.Ed. 644, it was argued that the 11th Amendment to the Constitution had not been proposed in due form, for the reason that it had not been presented to the President of the United States for his approval. The Attorney General of the United States, in answer, pointed out that the same course had been pursued relative to the adoption of the 11th amendment as had been pursued in the case of the 10 other Amendments previously adopted. At this point in his oral argument, he was interrupted by Justice Chase of the Supreme Court, who made the following statement:
"There can, surely, be no necessity to answer that argument. The negative of the President applies only to the ordinary cases of legislation. He has nothing to do with the proposition or adoption of amendments to the Constitution." *Page 238 
While the United States Supreme Court did not deliver a written opinion, it was unanimously ruled on the following day that the 11th Amendment was constitutionally adopted. This case appears to be the one occasion when this question was presented to the United States Supreme Court.
Other cases sustaining my views are as follows:
People ex rel. Stewart v. Ramer, 62 Colo. 128,160 P. 1032; Collier v. Gray, 116 Fla. 845, 157 So. 40; State ofLouisiana v. American Sugar Refining Co., 137 La. 407,68 So. 742; Warfield v. Vandiver, 101 Md. 78, 60 A. 538, 4 Am. Cas. 692; Commonwealth ex rel. Elkins v. Griest,196 Pa. 396, 46 A. 505, 50 L.R.A. 868; State ex rel.Morris v. Mason, 43 La. Ann. 590, 9 So. 776; In re SenateFile 31, 25 Neb. 864, 41 N.W. 981; Green v. Weller,32 Miss. 650; and Keohler v. Hill, 60 Iowa 543,14 N.W. 738, 15 N.W. 609.
Passing comment on some of these appears to be in order.
In the case of People ex rel. Stewart v. Ramer, supra, a Resolution of the General Assembly of the State of Colorado had been vetoed by the Governor, and the question was, therefore, squarely before the Supreme Court of that State. The Court held that the veto was inoperative and that the Governor was not a part of the legislative machinery involved in proposing amendments to the Constitution of that State. It appears from the decision of the Court that the Colorado Constitution gave to the Governor the power to veto other legislative matters.
The case of Louisiana v. American Sugar Refining Company,supra, is of considerable interest because the Court took occasion to make reference to the many Constitutions the State of Louisiana seems to have had. In the case before it for decision, it held that the Governor was not required to approve any proposed amendment to the Constitution, calling attention to the fact that under earlier Constitutions the Governor had been given that right. *Page 239 
The decision in Commonwealth ex rel. Elkins v. Griest,supra, was a decision before the Court of last resort of the State of Pennsylvania. An examination of the facts stated in the opinion shows that the Constitution of Pennsylvania contained provisions substantially similar to the two provisions in our own Constitution, which I have been discussing. The Court held that the approval of the Governor of Pennsylvania to amendments to the Constitution was not required, pointing out that the only authorities which have any right to assent or dissent to any constitutional amendment were the two Houses of the General Assembly and the people.
In the case reported as In re Senate File 31, supra, it had been urged upon the Supreme Court of Nebraska that it had been the long-standing custom to submit to the Executive of that State proposals to amend the Constitution. In answer to that contention, the Nebraska Supreme Court said [25 Neb. 864, 41 N.W. 984]:
"Suppose, however, that, through mistake or a superabundance of caution, it is submitted to him, and he approves it, or, as in this case, retains it for more than five days, Sundays excepted, in what way does that affect the Resolution? It is still but a proposition, which has gained nothing from approval of the governor; but, to be of any validity it must be adopted by * * * the electors * * *. Suppose each branch of the legislature, under a mistake as to their duty, should cause the bill or resolution to be read at large on six different days (the Constitution of Nebraska required one reading on three different days), or perform any other act in its passage not required by law, would the bill or resolution, therefore, be void, if the acts done included all that the law requires? No one will so contend."
The Court then stated that there was a material difference between a failure to perform all that the Constitution required and the performance of more than was requisite.
In the course of its opinion in Warfield v. Vandiver,supra, the Maryland Court, holding that the approval of the *Page 240 
Governor was not necessary to a Joint Resolution proposing an amendment to the Constitution of Maryland, took occasion to point out that [60 A. 541]:
"Unless the express language of the Constitution has unequivocally clothed the Governor with such an authority in relation to proposed constitutional amendments, as is the case in Delaware, but in no other state, it cannot be borrowed from some other provision pertaining to a wholly different subject. Whilst the Governor is intrusted with power to protect the people against hasty legislation, he is not given a prerogative to guard them against themselves in the matter of amending the organic law. He is not superior to them. It is their will which he must obey; it is not his will which they must subserve."
Like South Carolina, the Maryland Constitution contained a provision requiring executive approval of every Bill passed by the General Assembly of that State.
The only seeming authority against the proposition to which my attention has been called is the California case ofHatch v. Stoneman, 66 Cal. 632, 6 P. 734. Unfortunately, the volume containing this decision was not available to counsel, and the holding of the California Court has been ascertained from comments made by other Courts, whose decisions were available. While it appears that the Supreme Court of California had held that before the question of amending the Constitution be submitted to the people, the approval of the Governor was required, it would seem that the method required of the California Legislature differed substantially from the method provided for in our Constitution and in other State Constitutions. Two legislative steps appeared necessary. The first was the adoption by the Legislature of California by the requisite vote of the proposed Amendment, and the second was the enactment of a Bill directing that the proposals thus agreed upon be submitted. The decision of the California Court seems to be that the Governor's approval on the Bill submitting the question was *Page 241 
essential for the reason that the Bill was similar to other legislative enactments.
I have earlier, in this opinion, indicated that authorities from other jurisdictions would not be controlling upon the Courts of this State. It is, however, a matter of satisfaction to find that other authorities do sustain the position which I have taken.
 Question 2
Was this particular Resolution adopted in such a way as to justify the submission of the amendment it proposed to the electors at the election held November 2d 1948?
Counsel have argued to me that notwithstanding that it was unnecessary to secure the Governor's approval to the Joint Resolution proposing the Amendment, the Legislature saw fit to make the effective date of the Resolution the occasion that it be approved by the Governor, and since it was presented to the Governor on the day of sine die adjournment, it did not become effective or operative until two days following the convening of the 1949 General Assembly. They have argued that because of this, the act of the Secretary of State in causing the question of the adoption of the Amendment to be submitted in the 1948 General Election was premature.
I recognize that as a general proposition, the Legislature may designate in the future the date upon which legislative action shall take effect. I have no argument with the soundness of this general rule, but, for the reasons which I shall point out, one Legislature may not make the effective date of a Joint Resolution proposed by it the occasion when a new or subsequent Legislature convenes. The provisions of Section 1, Article 16 of the Constitution, specifically state that if an Amendment be proposed and agreed to it must be submitted at the next general election thereafter for representatives. Furthermore, in order for it to become effective, it must be ratified by the next General Assembly. In other words, the approving action of two succeeding *Page 242 
Legislatures is required. Consequently, if the argument advanced by the plaintiff were to be followed, we would have a case where one General Assembly, the 87th, proposed the amendment; it became effective upon the convening of the 88th, and would have to be ratified by the 89th. In other words, we would not have the action of two successive General Assemblies upon the amendment. An entirely different General Assembly would intervene. This is counter to the plain mandate in the Constitution.
It is argued to me, however, that a Court cannot restate the language of legislative enactments in order to make it agree with some possible conclusion as to its intention. In support of this contention, they cite the case of Bray v. City Council of Florence, 62 S.C. 57,39 S.E. 810, 812, wherein our court said:
"The language declaring the intent of an act is as much beyond our power as the subject to which that declaration relates, and it would violate the principles of law to change the phraseology of a statute to make it conform to the assumed purpose of the lawgiver in any other way than as warranted by the rules of construction."
Once again, the proposition propounded by the plaintiff is correct, but it overlooks the fact that it is not only within the power of the Court, but its duty to declare the true legislative intent. One can be left in no doubt as to the legislative intent, if the Resolution as a whole is read. Section 2 directs the question propounded therein be submitted to the qualified electors at the next general election. That could mean but one thing viz., the election of November 2d 1948.
It has been pointed out that it was beyond the power of the General Assembly to,
(1) require the Governor's approval to the legislative vehicle, proposing the amendment to the Constitution, and,
(2) That it could not make it effective upon the occasion of the convening of the next General Assembly. *Page 243 
For this reason, the provisions of Section 3 are unconstitutional and of no effect.
Does this destroy the Act in toto? I think not. It is the duty of the Court to sustain the constitutional portions of an Act, when the constitutional part is capable of being severed from the unconstitutional part, so that each part may be read and stand by itself. Gillespie v.Blackwell, 164 S.C. 115, 161 S.E. 869. The situation here falls within that rule.
When, therefore, did the proposing resolution become effective? The answer is obvious. At such time as was necessary in order to permit the Secretary of State to perform the functions required by law of him in order that the proposal be properly submitted to the people at the election in 1948.
July 29, 1949.
Being satisfied that the Honorable J. Woodrow Lewis, Circuit Judge, correctly decided all issues in this case, we direct that the Decree filed by him, omitting the last paragraph, be published as the opinion of this Court.
All exceptions are overruled, and the judgment affirmed.