## 17312

MILLS MILL, Draper Corporation and The Powell Knitting Company, Appellants, v. Ernest E. HAWKINS *et al.*, Individually and Constituting the Una Water District Commission, Respondents, and SPARTANBURG CONCRETE COMPANY, Inc., Appellant, v. Ernest E. HAWKINS *et al.*, Individually and Constituting the Una Water District Commission, Respondents.

(103 S. E. (2d) 14)

516

*Messrs. Perrin & Perrin, Means & Browne,* and *J. Davis Kerr,* all of Spartanburg, *for Appellants,*

*Messrs. Perrin & Perrin, Means & Browne,* and *J. Davis Kerr,* of Spartanburg, *for Appellants,*

*Messrs. Butler & Chapman,* of Spartanburg, *for Appellant,*

*Messrs. Odom, Bostick & Nolen, Harvey W. Johnson,* and *Matthew Poliakoff,* all of Spartanburg, *for Respondents,*

*Messrs. Sinkler, Gibbs & Simons,* of Charleston, *for Intervenor,*

*Messrs. Perrin & Perrin, Means & Browne,* and *J. Davis Kerr,* all of Spartanburg, *for Appellants,*

*Messrs. Butler & Chapman,* of Spartanburg, *for Appellant, Spartanburg Concrete Company, Inc., in Reply.*

June 19, 1957.

OXNER, Justice.

This is an appeal from an order of the Circuit Court upholding the constitutionality of Act No. 582 of the 1955 Acts of the General Assembly, 49 Stat. at Large, p. 1400. Appellants attack this Act upon the grounds (1) that it is special legislation in contravention of Article III, Section 34, Subdivision IX of our Constitution, and (2) that it deprives them of their property without due process of law and denies them the equal protection of the laws, in violation of both the State and Federal Constitutions. Const. art. 1, § 5; U. S. Const. Amend. 14.

The Act in controversy creates a public corporation to be known as "Una Water District", embracing a certain area in Spartanburg County Adjacent to the City of Spartanburg, for the purpose of having said territory served by publicly operated water and sewer systems. The corporate authorities of the district were further empowered to make provision for the collection and disposition of garbage. In the preamble to this Act it was recited that the General Assembly had found that the area involved had become populated to the extent that these facilities were "necessary and desirable for the health and welfare of the inhabitants thereof."

It is contended that there was in effect at the time of the passage of the foregoing Act a general law on the subject enacted in 1934. Appellants argue that Act No. 734 of the Acts of 1934, 38 Stat. at Large 1292, now comprising Sections 59-601 through 59-625 of the 1952 Code, was clearly applicable and that there was no sound reason for special legislation.

The terms of both Acts are accurately set out in the dissenting opinion of Mr. Justice Legge and need not be re-

peated. The major differences may be briefly stated as follows:

(1) The Act of 1955 *creates* a public service district. The Act of 1934, which is a general law, authorizes the formation of such a district upon a petition signed by a certain number of landowners in the proposed district followed by a favorable vote of the qualified voters. Stated differently, the landowners and qualified voters were given no voice in the formation of the Una Water District, while they are in the formation of a district under the general law.

(2) The 1934 Act authorized the establishment of a district "for the purpose of supplying lights, and/or water and/or providing fire protection and/or providing a sewerage collection system and/or sewerage treatment plant or plants to that portion of any county in this State which is not included in any incorporated village or city." The collection of garbage is not included. The facilities covered by the 1955 Act are garbage, water and sewerage.

(3) The governing body of the Una Water District is appointed by the Governor upon the recommendation of a majority of the legislative delegation of Spartanburg County, while under the general Act the commissioners are elected by the qualified voters.

(4) Under the 1934 Act the rates must be fixed at a public hearing had after due notice. This is not required under the 1955 Act.

(5) Under the 1955 Act the commissioners are authorized to make regulations compelling the residents of the district to use water and sewer facilities. There is no such authority in the 1934 Act.

We might add that under neither act can general obligation bonds be issued without a favorable vote of the qualified electors.

One of the most important fields for the exercise of the police power is the protection of public health. Unsanitary conditions within any locality are a matter of vital concern

not only to those residing therein but frequently to those in adjacent areas. It was primarily for the protection of the public health that the 1934 Act authorized the formation of water and sewer districts. It will be noted that the creation of such a district was not made mandatory by this legislation. Necessarily reserved by the General Assembly was the inherent power to itself create a public corporation providing these facilities if the public health required. The exercise of this power does not depend upon the will of the landowners and residents of the area involved. When in a proper case they fail to act, the situation may be corrected by special legislation. It would be difficult in a general law to lay down with any degree of exactness the conditions which in every case would necessitate mandatory action by the State. There are too many varying factors involved.

In the area embraced within the Una Water District, the General Assembly, after due investigation, has found that the health of the inhabitants thereof requires that there be installed publicly operated water and sewer systems and that the corporate authorities of the district should be further empowered to make provision for the collection and disposition of garbage. While these findings are not conclusive, they are entitled to great respect. The testimony taken in this case falls far short of showing that these legislative conclusions are wholly unsupported. The Circuit Judge stated in his decree:

"In weighing the evidence in this case, this Court finds that this legislative finding of fact (that it is necessary for the inhabitants from a health and welfare standpoint to have publicly operated water and sewer systems), has not been rebutted. Plaintiffs' case fails to carry the burden of proof on this point. The defendants on the other hand fortified their position by having two sanitation employees of the Spartanburg County Health Department testify that a health survey had been made in the area as late as 1954, at which time every fifth house in the area was checked. They found an undesirable health menace prevalent throughout and

stated that the area had caused the Health Department more concern than any other in Spartanburg County. The testimony indicates that there are numerous surface privies in the area, sometimes accommodating several families. There are also some septic tanks. Surface privies were definitely contaminating the wells in the area, most of which were shallow. Living organisms and gasoline were found in the wells and three or more families sometimes used one well. Unquestionably there is a definite need for water, sewer and garbage facilities in the area and this Court so finds."

It appears from the record that some time prior to the passage of the legislation now under attack, a proceeding was instituted under the Act of 1929 creating the Spartanburg Metropolitan District, 36 Stat. at Large 992, as amended, for the purpose of creating as a water and sewer susbdistrict the identical area which was incorporated in the Una District. It was contemplated in this proceeding issuing general obligation bonds in the amount of $500,000. This proposal was opposed by the present appellants and the proceeding is still pending. Meanwhile, the Act of 1955 was passed.

Before a subdistrict can be formed under the 1929 Act, it is necessary that a petition be filed by one-third of the freeholders in the proposed subdistrict followed by a majority favorable vote of the qualified electors.

Evidently the General Assembly concluded that a water and sewer district covering this area would not be formed either under the 1929 Act or that of 1934 by voluntary action on the part of the freeholders and qualified electors or that the creation of same would be considerably delayed, and for the protection of the public health immediate State action was necessary. The apparent apathy on the part of some in this area doubtless led to the provision in the 1955 Act authorizing the commissioners to compel the residents to use water and sewer facilities. We do not think that the effort to remove the unsanitary conditions prevailing in this territory by special legislation was obnoxious to Article III, Section 34, Subdivision IX of the Con-

stitution. Under the circumstances, there was no general law applicable.

The foregoing conclusion is fully sustained by numerous decisions of this Court relating to special purpose districts. In fact, some of them go much further than it is necessary for us to go in the instant case, for here we are concerned with public health. Some of the special purpose districts which have been upheld were concerned primarily with mere conveniences or other matters not so vital to the public welfare.

In *Rutledge v. Greater Greenville Sewer District,* 139 S. C. 188, 137 S. E. 597, 598, the Court sustained the validity of a special act creating the "Greater Greenville sewer district", embracing the territory known as "Greenville school district" and "Parker school district." *Alley v. Daniel,* 153 S. C. 217, 150 S. E. 691, upheld a special act establishing a sewer district in Spartanburg County to be known as "Spartanburg Metropolitan District." In *Floyd v. Parker Water & Sewer Sub-District,* 203 S. C. 276, 17 S. E. (2d) 223, this Court upheld a special act empowering the Parker Water and Sewer Sub-District, which was a special purpose district and a part of the Greater Greenville Sewer District, to issue bonds for the purpose of extending and enlarging water lines throughout the district, installing fire hydrants, establishing a fire protection system, extending the sewer lines, and instituting a system of garbage disposal. Fire protection and garbage disposal were added facilities. In *Sanders v. Greater Greenville Sewer District,* 211 S. C. 141, 44 S. E. (2d) 185, a special act was sustained providing a method whereby an area lying without the limits of the Greater Greenville Sewer District might become incorporated into that district and form a part of one of its subdistricts. Following these and other decisions along the same line, the General Assembly has created by special acts numerous water and sewer districts. In no instance has such an act been declared invalid by this Court.

Prior to the decision in *Rutledge v. Greater Greenville Sewer District, supra,* this Court had sustained legislation creating special districts for highway and bridge purposes. One of the leading cases in this category is *Briggs v. Greenville County,* 137 S. C. 288, 135 S. E. 153.

It has also been generally held that special legislation relating to the fiscal affairs of a county, including the issuance of bonds by a county, a school district or other political subdivision, is not obnoxious to Article III, Section 34, Subdivision IX of the Constitution. *Gaud v. Walker,* 214 S. C. 451, 53 S. E. (2d) 316; *State ex rel. Milford v. Brock,* 66 S. C. 357, 44 S. E. 931; *Burriss v. Brock,* 95 S. C. 104, 79 S. E. 193. In *Briggs v. Greenville County, supra,* the Court said: "It is settled by the decisions of this court that a special act authorizing a county or other political subdivision to issue bonds is not within the constitutional prohibition."

Our attention is called to the fact that in *Rutledge v. Greater Greenville Sewer District, supra,* and the subsequent cases involving the validity of water and sewer districts, no issue was made as to Section 34, Article III of the Constitution. The omission might have been due to an assumption that as to special purpose districts the question had been settled in *Briggs v. Greenville County* and several other cases involving road districts. The failure to raise the question in the *Rutledge case* was alluded to by Mr. Chief Justice Stukes in *Owens v. Smith,* 216 S. C. 382, 58 S. E. (2d) 332, 335. [137 S. C. 288, 135 S. E. 162.] The Court there declared invalid, as special legislation, an act empowering the commissioners of a public service district in Charleston County to promulgate and enforce zoning regulations. It was stated in this case: "Appellants also cite and rely upon the cases of *Rutledge v. Greater Greenville Sewer District,* 139 S. C. 188, 137 S. E. 597, and *Floyd v. Parker Water & Sewer Sub-District,* 203 S. C. 276, 17 S. E. (2d) 223. They are distinguishable as involving public improvement districts, necessitating special legislation for their creation and opera-

tion, which appears to have been *properly* assumed in the opinions." (Italics ours.) Later in *Wagener v. Johnson,* 223 S. C. 470, 76 S. E. (2d) 611, 614, the Court quoted with approval the following from the Circuit Court decree: "Numerous decisions of our Court uphold the validity of legislation creating special purpose districts, including districts established for the purpose of constructing, operating and maintaining Waterworks Systems and it is needless for me to discuss this question in further detail."

It is further argued that *Rutledge v. Greater Greenville Sewer District, supra,* is not applicable because it was rendered prior to the enactment of the general law in 1934. But we do not understand that Subdivision IX, Section 34 of Article III permits special legislation in all cases where there is no general law on the subject. After enumerating in Section 34 certain subjects concerning which local or special laws shall not be enacted, it is provided in Subdivision IX: "In all other cases, where a general law can be made applicable, no special law shall be enacted." The controlling question is not whether there is a general law on the subject but whether a general law can be made applicable.

There may be some foundation for the statement in one of the briefs that our decisions are not entirely clear as to the basis upon which it has been held that legislation creating special purpose districts is not within the prohibition of Article III, Section 34 of the Constitution. But the reasoning is not as important as the result. As to those decisions upholding special districts created for the purpose of furnishing water, sewerage, garbage collection, etc., the writer, speaking only for himself, thinks they may be soundly sustained under Section II, Article VII of the Constitution which authorizes the General Assembly to "make special provision for municipal government." As pointed out in *Sanders v. Greater Greenville Sewer District, supra,* 211 S. C. 141, 44 S. E. (2d) 185, these are functions which are usually performed by a municipality. In fact, districts of this nature have been regarded as municipal corporations with limited

functions. In *Floyd v. Parker Water and Sewer Sub-District,, supra,* 203 S. C. 276, 17 S. E. (2d) 223, 227, the Court said that the sub-district there under discussion was "a corporation or agency endowed with limited corporate functions, but they are derived from the same source and exercised in substantially the same way as any other municipal corporation. It is an arm of government created by the Legislature for a specific public purpose, that is, fire protection and garbage disposal. And we find nothing in the Constitution which takes from the Legislature the power to create a special district with limited powers." In *Rutledge v. Greater Greenville Sewer District, supra,* 139 S. C. 188, 137 S. E. 597, 600, the Court said: "While the term 'municipal corporation' is generally understood to mean cities and towns incorporated under the general laws of the state, it is also true that where, as in the case at bar, a body politic and corporate is established by the Legislature with power to perform municipal functions, such as the establishment of a sewer system for the benefits of the inhabitants of such area, and with power to issue bonds for the purpose of raising funds for such purposes, that such an area being a public corporation and having certain municipal powers and duties, is properly held to be a municipal corporation within the meaning of the section of the Constitution."

In concluding our discussion of this phase of the case, we desire to say that there may be some merit in the view that our decisions have gone rather far in upholding the constitutionality of special purpose districts, particularly in those instances where there was no real necessity for a special act. But upon the strength of them millions of dollars in bonds have been issued and are outstanding. In this field, as in the case of the law relating to real estate, it is very important that there be stability and uniformity in our decisions.

The next question is whether the Act denies appellants the constitutional guaranty of due process of law and the equal protection of the laws.

Appellants point out that at considerable expense they have heretofore installed water and sewer facilities which adequately serve their plants and have also permitted all individual property owners who so desire to tap their lines. For this reason, it is said they will receive no benefit from the contemplated public improvements. It is also contended that the boundaries of the district were arbitrarily fixed by the Legislature with the view of requiring appellants, large taxpayers, to assume the major burden of supporting the district.

We do not think that the mere fact that a taxpayer has installed water and sewer facilities which are adequate to serve his property precludes the General Assembly from thereafter incorporating his lands in a publicly operated water and sewer district. The right of the soverign to improve is paramount and a voluntary improvement for the owner's own convenience cannot be used to relieve him from his share of the costs where it has been determined that a general improvement is necessary. Appellants installed these facilities with full knowledge of the possibility that this area might later be incorporated in a public improvement district. Applicable is the following language of the Court in *City of Atchison v. Price,* 45 Kan. 296, 25 P. 605, 611:

"Some of the defendants in error had constructed private sewers or drains at their own expense, and they now claim that they should not be taxed for the sewer built by the city. While one of these drains was quite expensive, it is not found or stated that any of them were authorized or adopted by the city as a part of the sewer system, nor that they are suitable or adequate for the purposes intended. The legislature has conferred upon the city authorities the discretion and power to provide sewerage facilities, and for that purpose has given them control of the streets and alleys where the sewers are built. They are to determine the necessity for sewers, as well as the character and capacity of those that are required to be built. To allow property owners to decide

for themselves whether their lots needed sewerage facilities, or to permit them to provide private ditches, drains, sewers, or cess-pools as they might determine to be sufficient, would be wholly impracticable, and would prevent the adoption of a general sewerage system under the control of the city, as the statutes evidently contemplate."

There are other decisions to the same effect. *City of Philadelphia v. Odd Fellows' Hall Association,* 168 Pa. 105, 31 A. 917; *Hempel ex rel. Michigan Limestone & Chemicals Co. v. Rogers Tp.,* 313 Mich. 1, 20 N. W. (2d) 787; *Northern Pacific Terminal Company v. City of Portland,* 9 Cir., 80 F. (2d) 738. In the last mentioned case it was held that the fact that a railroad terminal company had constructed a private sewer system adequate for its needs did not preclude assessment of its property, on the basis of benefits received, for construction of a city sewerage system.

It may not be amiss to point out that the commissioners of the Una District are authorized by the Act to "purchase, acquire and continue the use and operation of any and all of the water lines and sewer lines that may presently exist in the area." It is fair to assume that under this provision appellants will be compensated for any of their lines which are suitable for use in the plans adopted by the commissioners.

We cannot say that the Legislature palpably abused its discretion in fixing the boundaries of this district. Its creation was an act of sovereignty. The Legislature itself may create a district of this kind and fix its boundaries. Where it does so, the landowners included therein are not entitled to a hearing on the question of whether their lands will be benefited. Prior inquiry by the legislative body is presumed. *Sanders v. Greater Greenville Sewer District, supra,* 211 S. C. 141, 44 S. E. (2d) 185. The Legislative determination can be assailed under the due process and equal protection clauses "only where the legislative action is 'arbitrary, wholly unwarranted,' 'a flagrant abuse, and by reason of its arbitrary character a confiscation of partic-

ular property.' " *Branson v. Bush,* 251 U. S. 182, 40 S. Ct. 113, 115, 64 L. Ed. 215.

It is equally well settled that to justify an assessment of benefits to particular lands, it is not essential that the benefits be direct or immediate. *Valley Farms Co. v. County of Westchester,* 261 U. S. 155, 43 S. Ct. 261, 263, 67 L. Ed. 585. Nor is there any requirement "that for every payment there must be an equal benefit." *Houck v. Little River Drainage District,* 239 U. S. 254, 36 S. Ct. 58, 60 L. Ed. 266. Due process does not require absolute equality. *Sanders v. Greater Greenville Sewer District, supra.* In *Kansas City Southern Ry. Co. v. Road Imp. Dist. No. 3,* 266 U. S. 379, 45 S. Ct. 136, 139, 69 L. Ed. 335, the Court said: "True, the amount of benefits which will accrue to the railway property is largely a matter of forecast and estimate; but the same thing is true of the farm lands and town lots, and also of benefit assessments in general. * * * Forecast and estimate, based on a solid premise of fact and experience, are not to be confused with mere speculation and conjecture."

Reverting now to the facts of this case, the area comprising the Una Water District constitutes a part of the Spartanburg Metropolitan District created in 1929. Since that time there has been a six mill levy on all property in the master district for sewerage disposal. No benefits have accrued from this tax assessment to any of the property owners in the Una District except those who have privately installed water and sewer facilities. Adjoining the Una District are the City of Spartanburg and several water and sewer subdistricts. It is probable that the Legislature was undertaking to provide a general and comprehensive water and sewerage system for those areas which had developed around the City of Spartanburg and in doing so found it was not practicable to exclude appellants' lands and other small portions now served by these facilities. But be that as it may, we cannot say that the fixing of the boundaries of the Una Water District was a flagrant abuse of legislative discretion.

Nor can we say that appellants have successfully rebutted the presumption that their property will be benefited. Their plants are near certain areas in the district known as the Una and Johnson City communities. The undisputed testimony shows that unsanitary conditions are prevalent in these two communities and constitute a health menace. The danger does not always stop at the boundaries of such areas but may extend to the entire neighborhood. When these unsanitary conditions are removed, it may result in the improvement of public health throughout the district. It further appears that several of the appellants have considerable undeveloped acreage surrounding their plants which may be benefited by the installation of a publicly operated water and sewer system. It is well known, as pointed out in *Floyd v. Parker Water & Sewer District, supra,* 203 S. C. 276, 17 S. E. (2d) 223, that the installation of water and sewer facilities generally results in considerable enhancement of property values. A further consideration is the fact that the corporate authorities of the district are authorized to provide for garbage disposal, a facility not previously enjoyed by anyone in the district. While appellants may receive considerable less benefits than those property owners now without sewerage and water, we would not be warranted in saying that the tax burden which will be placed upon them will so materially exceed the benefits received as to be palpably arbitrary.

The only other question raised by the exceptions is whether the Circuit Judge erred in not requiring respondents to produce the "report of Harwood Beebe Company as to the layout, cost and other matters with respect to the proposed water and sewer systems in the District." It appears that as far back as 1946 a group of interested citizens initiated a movement to obtain water and sewerage for the area now embraced in the Una Water District and engaged the Beebe Company, local engineers, to draw some plans and specifications and make cost estimates pertaining to the area. This data was used several years ago

in a proceeding before the commissioners of public works wherein it was sought to obtain sewerage for this area under the act establishing the Spartanburg Metropolitan District. Respondents, who were not parties to that proceeding, testified that they had seen the plans made by the Beebe Company but did not have them and did not know where they were. We agree with the trial Judge that appellants should have subpoenaed the members of this firm and required them to bring the plans into court. We find no error.

All exceptions are overruled and the order of the Circuit Court affirmed.

TAYLOR and MOSS, JJ., concur.

LEGGE, Justice (dissenting.)

Being unable to agree with the majority of the court in their view of this case, I shall record as briefly as may be the reasons that compel my dissent.

In two cases consolidated in the trial court, appellants, individually and on behalf of other taxpayers in Una Water District in Spartanburg County, attacked Act No. 582 of the 1955 General Assembly as unconstitutional; and from an adverse decree they now appeal. With this court's permission, North Charleston Public Service District has intervened on the side of the respondents, and its counsel have filed a brief, in which counsel for numerous "special purpose" districts have joined, in support of the circuit decree. Two substantial issues are here presented, *viz.*:

1. Is the act special legislation within the prohibition of Subdivision IX of Article III, Section 34, of the Constitution of 1895?

2. Is the effect of said act to deprive appellants of property without due process of law in violation of Section 1 of the Fourteenth Amendment of the Constitution of the United States and Article I, Section 5, of the Constitution of this State?

The Act in question (Act of May 19, 1955, XLIX Stat. at Large 1400) is entitled:

"An Act To Create Una Water District In Spartanburg County; To Define Its Areas; To Establish A Governing Commission Therefor; To Prescribe The Functions And Powers Of The District And Its Commission; To Make Provision For Borrowings By The District, Including The Issuance Of Not Exceeding Five Hundred Thousand Dollars Of General Obligation Bonds; To Prescribe The Terms And Conditions Under Which Monies May Be Borrowed By The District; And To Make Provision For Their Payment."

Its preamble recites that the General Assembly, after due investigation, has found that the district in Spartanburg County created by the act "has become populated to an extent that makes it necessary and desirable for the health and welfare of the inhabitants thereof to be served by publicly operated water and sewer systems, and that in addition thereto the district hereby created should be empowered to make provision for the collection and disposition of garbage for the district", and that as a consequence of such findings the General Assembly has determined to constitute the area a "special purpose district" and to provide "a governing body for the district" with the powers enumerated in the act.

Section 1 creates as a public corporation, to be known as Una Water District, an area in Spartanburg County lying to the northwest of and adjacent to the city of Spartanburg.

Section 2 provides that the district shall be operated and managed by a commission, to be known as "Una Water District Commission", composed of three electors resident in said district, to be appointed by the Governor upon the recommendation of a majority of the legislative delegation of Spartanburg County, and to hold office, initially, for terms of two, four and six years respectively. It provides for the appointment in like manner, but for a term of six years, of a successor upon the termination of office of any commissioner, and that a vacancy during term of office occurring by reason of death, resignation or otherwise shall be filled by like appointment for the remainder of the term.

Under Section 3 there is committed to the district "the functions of purchasing, acquiring, constructing, operating, maintaining, improving and extending a water distribution system, a sewer system and a system for the collection and disposition of garbage"; and to that end the powers of the commission are detailed in twenty-two subsections. Those relating to the fixing of rates and the issuance of bonds are as follows:

Subsections 13 and 14 empower the commission to "place into effect and to revise, whenever it so wishes" schedules of rates and charges for water furnished by its water distribution system and for use of its sewage disposal system.

Subsection 19 empowers the commission to issue, under the conditions prescribed by Subsection 21, general obligation bonds of the district to an amount not exceeding $500,-000.00.

Subsection 20, together with its nine subdivisions, provides that, in addition to its powers under subsection 19, the commission may borrow money and issue bonds, notes and other evidences of indebtedness payable solely from revenues derived from the operation of any revenue producing facility. It further provides, as a convenient procedure for borrowing money pursuant to said subsection, that the district shall be fully empowered to avail itself of all powers granted by Sections 59-361 through 59-415 of the 1952 Code, generally known as the Revenue Bond Act For Utilities, and by Sections 59-651 through 59-682, generally known as the Revenue Bond Refinancing Act of 1937.

Subsection 21 provides that the proceeds of the general obligation bonds of the district shall be used to defray the cost of purchasing, constructing and establishing in the district a water system or a sewer system, or both, together with expenses incident to such purchase, construction and establishment; and that such bonds shall be issued only in the event that in a special election provided for under subsection 22 a majority of the qualified electors of the district shall have voted in favor of such issue. Subdivision (a) of

subsection 21 provides that such bonds may be issued as a single issue or from time to time as several separate issues, and that maturities, interest rates and call provisions may be fixed by the commission. Subdivision (b) provides that such bonds shall be sold at not less than par plus accrued interest to date of delivery; that the commission shall, at least ten days prior to any sale, publish notice of its intention to receive bids for such bonds, reserving the right to reject any and all bids; and that, if all bids shall be rejected, the commission may negotiate privately for the disposition of such bonds.

Section 4 provides that revenues not required to discharge covenants under obligations authorized by the act shall be used by the commission for purposes germane to the functions of the district.

Section 5 declares that rates fixed by the commission for services furnished by any revenue producing facility shall not be subject to supervision or regulation by any bureau, commission or other like agency of the State.

Section 6 exempts the property and income of the district from all state, county and municipal taxes.

Section 7 provides that, so long as any obligations of the district issued pursuant to the act shall be outstanding, the powers granted by the act to the district and the commission shall not be diminished or restricted.

Section 8 provides a penalty for wilful injury to or impairment of any facility of the district, and for obtaining water from its distribution system otherwise than in accordance with regulations promulgated by the commission.

Section 9 provides that unconstitutionality of any part of the act shall not affect the validity of the remainder.

Section 10 repeals inconsistent acts.

Section 11 declares the act effective upon the Governor's approval.

Una Water District, as created by the act before mentioned, is crossed by the main line of the Southern Railway,

running generally east-west and dividing the district into two parts of approximately equal area. In the southern area are the textile plants of the appellants Mills Mill (Saxon Plant) and Powell Knitting Company, and the textile machinery warehouse and offices of the appellant Draper Corporation. The manufacturing plant of Spartanburg Concrete Company, Inc., is in the northern area. Also located in the northern area are two suburban communities known respectively as Una and Johnson City. The Spartanburg County Home and a tuberculosis hospital are located in the extreme northwestern portion of the district.

On the tract of land owned by Mills Mill, comprising about 160 acres, are located its manufacturing plant known as the Saxon Plant, and twenty-four residences owned by the corporation and occupied by its employees; and immediately adjacent to this tract are one hundred seventy-seven residences recently sold by the corporation to its employees. These properties together constitute what is generally known as the Saxon Mill Village or Community, which is adequately served by a water system and a sewer system with all necessary lateral lines. These systems were installed by the predecessor in title of Mills Mill, are owned by Mills Mill, and are connected with the water and sewer lines of Spartanburg Water Works.

Draper Corporation's warehouse and offices are located on a 25-acre tract owned by it. In addition, the corporation formerly owned, and recently sold, some nine or ten acres on which it had constructed fifteen houses for its employees. About 1929 the corporation installed a complete system of water and sewer lines, which are connected with the water and sewer lines of Spartanburg Water Works, and which adequately serve the warehouse and offices and houses before mentioned.

Powell Knitting Company owns a tract of about 85 acres, on which are located its manufacturing plant and eleven residences occupied by some of its employees; recently it sold to its employees approximately eighteen acres adjoining

this tract, on which there were and are forty-five dwellings. Powell Knitting Company heretofore installed on these tracts a water system and a sewer system, which are still in operation and adequately serve all manufacturing and domestic purposes on said tracts. The company has conveyed the water system to the Commissioners of Public Works, but still owns the sewer system.

Spartanburg Concrete Company has itself provided water and sewage facilities adequate to serve its manufacturing and domestic needs.

Una Water District will obtain its water supply from the Spartanburg municipal waterworks system, with which the private systems of the respective appellants are already connected as before stated.

Testimony on the part of appellants indicates that in the portion of the district lying to the south of the Southern Railway tracks there are, in addition to the 272 residences served by the water systems of appellants before mentioned, 289 residences that are served by the Spartanburg waterworks system, and only 24 that are not so served. On the other hand, it is apparent from the evidence that the residences in the Una and Johnson City communities, in the northern portion of the district, are substandard in respect of both water and sewage disposal, depending for their water supply upon wells for the most part shallow and unprotected against pollution, and having no sewage disposal arrangements other than septic tanks; and that the situation thus existing is, from the standpoint of public health, undesirable and fraught with some degree of hazard.

The assessed valuation for tax purposes of the properties of Mills Mill, Draper Corporation and Powell Knitting Company amounts in the aggregate to about one-third of the total assessed valuation of all property in Una Water District. Respondents propose to issue $500,000.00, of general obligation bonds, retirement of which, over a period of twenty years, would require an additional property tax levy

of between thirty and thirty-four mills, depending upon the rate of interest.

A legislative enactment is presumed valid, and will not be declared unconstitutional unless its conflict with some provision of the constitution appears so clearly as to leave no room for reasonable doubt. *Bolt v. Cobb,* 225 S. C. 408, 82 S. E. (2d) 789; *Edens v. City of Columbia,* 228 S. C. 563, 91 S. E. (2d) 280; *State ex rel. Thompson v. Seigler,* 230 S. C. 115, 94 S. E. (2d) 231. The high prerogative of the courts to determine the limits of the power of the legislature under the constitution is to be exercised with the utmost care and circumspection. *Doran v. Robertson,* 203 S. C. 434, 27 S. E. (2d) 714.

Where the constitutionality of an act depends upon pertinent facts, the findings and declarations of the legislature are entitled to great respect. *State ex rel. Edwards v. Query,* 207 S. C. 500, 37 S. E. (2d) 241; *Richards v. City of Columbia,* 227 S. C. 538, 88 S. E. (2d) 683. But if such findings and declarations were conclusive, the legislature itself would be the final arbiter of its own power, and there could be no effective constitutional control. *Doran v. Robertson, supra.*

The issue of constitutionality *vel non* is therefore, in the final analysis, a judicial, not legislative, matter, *Kalber v. Redfearn,* 215 S. C. 224, 54 S. E. (2d) 791; and where a legislative enactment clearly infringes on constitutional restraints, the court should not hesitate to so declare, nor should it evade this responsibility by forced construction of constitutional provisions. *State ex rel. Edwards v. Osborne,* 195 S. C. 295, 11 S. E. (2d) 260.

Article III, Section 34, of the Constitution of 1895, after declaring that the General Assembly shall not enact local or special laws concerning certain subjects or for certain purposes set forth in subsections I through VIII (not pertinent here), provides in subsection IX as follows:

"In all other cases, where a general law can be made applicable, no special law shall be enacted".

On March 2, 1934, the Governor approved an Act of the General Assembly (XXXVIII Stat. at Large 1292) entitled:

"An Act to Authorize the Establishment of Electric Lighting Districts, Water Supply Districts, Fire Protection Districts, and Sewer Districts in Communities Which Are Not Incorporated as Towns or Cities and to Authorize Such District to Issue Bonds for the Cost of Construction of Electric Lighting, Water Supply, Fire Protection, and Sewerage Plants, to Levy Taxes for the Payment of the Same and for the Creation of Commissions for the Control and Management of Electric Lighting Districts, Water Supply Districts, Fire Protection Districts, and Sewer Districts so Created, and Defining their Powers and Duties."

That Act was codified in 1942 as Section 8555-131 through 8555-140; it appears in the 1952 Code as Chapter 4 of Title 59 (Sections 59-601 through 59-625), and it is still in effect. Its provisions, as last codified, are as follows:

"59-601. In order to protect the public health, electric lighting districts, water supply districts, fire protection districts and sewer districts may be established as herein provided for the purpose of supplying lights and/or water and/or providing fire protection, a sewerage collection and/or a sewerage treatment plant to a portion of any county in this State which is not included in any incorporated city or town".

We note, in passing, that Una Water District, as created by the Act of 1955, lies in a portion of Spartanburg County which is not included in any incorporated city or town.

59-602 provides that before any such district is formed there shall be filed with the clerk of the court of the county in which such district is proposed to be located: (1) a petition signed by a majority of the resident landowners in the proposed district or by the owners of more than half the land and acreage, as shown by the tax assessment rolls, to be affected by or assessed for the expense of the proposed

improvements; and (2) a plat showing the limits of the proposed district.

59-603. When the clerk of court shall have approved the petition, he shall call an election of the qualified voters of the district to vote upon the establishment of the district and of the electric light, water supply, fire protection and/or sewerage plant.

59-604 provides that only those electors shall be allowed to vote who return real and personal property for taxation within the district and who exhibit their tax receipts and registration certificates as required in the general election. We are not here concerned with the validity of these restrictions, but see *Cothran v. West Dunklin Public School District,* 189 S. C. 85, 200 S. E. 95.

59-605 provides that the clerk of court shall select the place for the holding of the election, appoint managers, and give notice of the time and place of the election.

59-606 provides that at the said election the qualified voters, in addition to voting on the question of establishing the district and the utilities involved shall elect three commissioners of the district, who shall hold office for a term of six years and until the election and qualification of their successors; the members of the first commission to have terms of two, four and six years respectively, and thereafter one commissioner to be elected at each state biennial election.

59-607 provides that the newly elected commissioners shall meet and organize, elect a chairman, and determine by lot which of them shall hold the two, four and six year terms respectively.

59-608 provides that the commissioners shall serve without emolument, but shall appoint a paid secretary.

59-609 gives to the board of commissioners broad general powers, *e. g.*; (1) to purchase, build or contract for building electric light, water supply, fire protection and sewerage systems; (2) to lease, own, hold and acquire all necessary equipment for such purposes, and operate the same; (3) to

contract with existing light and water companies and municipalities or other districts; and (4) to fix rates for the use of lights, water, fire protection and sewerage facilities.

59-610 requires that the plat showing the limits of the district be filed with the county auditor.

59-611, reciting that the purpose of the establishment of such districts is to provide better sanitary conditions for the people thereof, provides that the boards of commissioners of such districts shall have power of condemnation for such purpose.

Sections 59-612 through 59-615 relate to the establishment of rates by the board of commissioners, and provide, among other things, that no such rates shall be established except after a public hearing, notice of which, setting forth the proposed schedule of rates, shall be published at least ten days prior to the date of the hearing.

Sections 59-616 through 59-620 provide for the issuance by the commissioners of serial coupon bonds to meet the cost of constructing or acquiring the utilities involved; that such bonds shall bear interest not exceeding six per cent per annum, and the last of them shall mature not more than twenty years after the date of issue; and that before any such bonds are issued the question of their issuance shall be submitted to the qualified voters of the district, and approved by a majority of them voting, at an election to be held upon the written petition or request of at least one-third of the resident electors and a like proportion of the freeholders.

Section 59-621 exempts such bonds from state, county and municipal taxation.

Section 59-622 authorizes the commissioners to avail themselves of Federal loans and to issue revenue bonds in liquidation of such loans.

Sections 59-623 and 59-624 provide for submission of annual budgets to the county supervisor when the income derived from the public works is insufficient to meet the cost

of maintenance and operation; and for the levy of taxes to meet such expenses.

Section 59-625 reads as follows: "This chapter being necessary for the public health, safety and welfare, it shall be liberally construed to effectuate the purposes thereof. But all functions, powers and duties of the State Board of Health shall remain unaffected by this chapter".

We are not concerned here with inquiry as to whether, as was indicated in *State v. Higgins,* 51 S. C. 51, 28 S. E. 15, 38 L. R. A. 561, Article III, Section 34, Subdivision IX prohibits enactment of a special law on a subject as to which a general law would be appropriate, where no such general law has been enacted. Here a general law on the subject has been enacted and was in effect at the time of the passage of the special act. The issue before us under Article III, Section 34, Subdivision IX is simply this: Could the general law (Code, 1952, Title 59, Chapter 4) have been made applicable in the establishment of Una Water District?

In the writer's view, the general law was clearly applicable. The 1955 act suggests no sound reason to the contrary; certainly none is to be found in its preamble to the effect that the area had become populated to the extent that publicly operated water and sewer systems were necessary and desirable for the health and welfare of its inhabitants. The general law was by its express language (Code 1952, Sections 59-601, 59-625) enacted for the protection of the public health and welfare, and was obviously designed to cover just such a situation as the present.

Nor does the 1955 act or the record before us suggest any reason why the qualified electors in the area in question should be deprived of the rights accorded under the general law to vote upon the question of the establishment of the water district, to elect the commissioners thereof, and to be heard concerning rates and service charges proposed to be fixed by the commissioners. Cf. *Town of Forest Acres v. Town of Forest Lake,* 226 S. C. 349, 85 S. E. (2d) 192.

Can the 1955 act be sustained, then, as a special provision in such general law within the meaning of Article III, Section 34, Subdivision X? I think not, because its denial of the rights referred to above was a radical departure from essential principles of the general law. *State ex rel. Schroder v. Burns,* 73 S. C. 194, 52 S. E. 960.

I am unable to agree with respondents' contention that the issues here are foreclosed in their favor by earlier decisions upholding acts creating special districts. Not all of the decisions can be reconciled; but it is apparent from review of them that where special acts have been upheld against the claim of unconstitutionality under Article III, Section 34, Subdivision IX, the decision has been based upon the absence, assumed or proven, of applicable general laws; and that the constitutional sanction of "special provisions in general laws" may not be invoked to sustain a special act that radically departs from essential principles of applicable general law.

In *Carolina Grocery Company v. Burnet,* 61 S. C. 205, 39 S. E. 381, 58 L. R. A. 687, a general act providing for the government of the various counties of the state had been amended so as to make special provisions for the government of certain counties. As against attack under Subdivision IX (then XI) of Section 34 of Article III, the act, so far as it related to Charleston County, was upheld as a special provision in the general law within the proviso in Subsection X (then XII); and it was there pointed out that Article III, Section 34, should be construed in connection with Article VII, Section 11, authorizing the General Assembly to provide such system of township government as it might think proper in any and all counties, and to make special provision for municipal government. Here it was said that while in its strict sense the term "municipal" connotes incorporated cities, towns and villages, it could properly be construed as characterizing the government "of a county or township".

In *Arnette v. Ford,* 129 S. C. 526, 125 S. E. 138, following *Walker v. Bennett,* 125 S. C. 389, 118 S. E. 779, a special act consolidating several school districts was held valid as a special provision in the general school law. To like effect was the decision in *Powell v. Hargrove,* 136 S. C. 345, 134 S. E. 380.

In *Battle v. Willcox,* 128 S. C. 500, 122 S. E. 516, which involved an act authorizing the Commissioners of Marion County to issue bonds of Reaves Township for the establishment of a hospital, there was no issue under the constitutional provisions with which we are presently concerned.

*Briggs v. Greenville County,* 137 S. C. 288, 135 S. E. 153, involved the validity of bonds proposed to be issued by the county under authority of the so-called "Greenville Bond Act" (XXXIV Stat. at Large 1534) to finance the construction in that county of highways embraced within the State Highway System, said bonds to be secured by the county under reimbursement agreement pursuant to the general highway act commonly known as the "Pay-As-You-Go Act" (XXXIII Stat. at Large 1193) as amended by the General Bond Act of April 2, 1926 (XXXIV Stat. at Large 1001) which authorized the issuance by counties of bonds for such purpose. With regard to the contention that the Greenville Bond Act violated the constitutional provision against special legislation, the court sustained the act as a special provision in the general law. It would seem that the act might also have been sustained under the constitutional amendment of February 18, 1905 (Const. Am. Art. II) providing that "the General Assembly of this State may enact local or special laws concerning the laying out, opening, altering or working roads or highways"; but this provision was not mentioned. It is true, as respondents point out, that the opinion in that case contains the statement that "a special act authorizing a county or other political subdivision to issue bonds is not within the constitutional prohibition" [137 S. C. 288, 135 S. E. 162] (*i. e.* Article III, Section 34, Subdivision IX) ; but this pronouncement was

not necessary to the decision of the issue, nor do I think that *Sullivan v. City Council of Charleston,* 133 S. C. 189, 130 S. E. 876, 133 S. E. 340, and *City of Columbia v. Smith,* 105 S. C. 348, 89 S. E. 1028, cited as authority for it, warrant it.

The same broad statement, with citation of the same two cases as authority for it, appears in *Evans v. Beattie,* 137 S. C. 496, 135 S. E. 538, which was decided three days before the *Briggs case;* and the same comment is applicable. *Evans v. Beattie* involved the Coastal Highway Act of 1926, which constituted the territory embraced within six counties a highway district and provided for the construction of certain highways therein, and for the financing of such construction. The contention that the act was special legislation within the purview of Article III, Section 34, Subdivision IX was properly rejected in view of the constitutional amendment of February 18, 1905 (Const. Am. Art. II) to which we have already referred.

The cases of *City of Columbia v. Smith* and *Sullivan v. City Council of Charleston, supra,* cited in the *Briggs* and *Evans cases,* deserve brief mention.

In the *Smith case* it was held that a special act relating to the drawing of juries in the Recorder's Court of the City of Columbia was not within the prohibition of Article III, Section 34, Subdivision IX, in view: (1) of the other constitutional provisions with which it must be construed, and which empower the General Assembly (Article V, Section 1) to establish municipal and other inferior courts and (Article VIII, Section 1) to provide by general laws for the organization and classification of municipal corporations; and (2) of the decisions in *City of Greenville v. Foster,* 101 S. C. 318, 85 S. E. 769, which upheld the act establishing the Recorder's Court of the City of Greenville, and *State ex rel. Spencer v. McCaw,* 77 S. C. 351, 58 S. E. 145, where an act extending the boundaries of a school district had been upheld as a special provision in the general law.

In the *Sullivan case,* where the validity of certain certificates of indebtedness of the City of Charleston was in issue, the act authorizing their issuance was attacked under Article III, Section 34, Subdivision IX, and it was also contended that such certificates would create a new indebtedness in violation of Article II, Section 13 and Article VIII, Section 7. These contentions were brushed aside without discussion, the majority opinion merely stating that they were untenable in the light of *Thomas v. Spartanburg Ry., Gas & Electric Co.,* 100 S. C. 478, 85 S. E. 50, *City of Columbia v. Smith, supra,* and *Barnwell v. Matthews,* 132 S. C. 314, 128 S. E. 712. But none of the three cases thus cited really supports the Sullivan decision. We have already discussed *City of Columbia v. Smith, supra.* In *Barnwell v. Matthews, supra,* the only constitutional provision invoked against the county bond issue in question was Article X, Section 5; there was no issue under Article III, Section 34. And in *Thomas v. Spartanburg Ry. Gas & Electric Co., supra,* the act, which required that street railway cars operating north of a line ten miles north of and parallel to the thirty-first meridian be equipped with fenders, was held not violative of Article III, Section 34, Subdivision IX because the classification was not arbitrary in view of the steep grades and sharp curves in trackage in that section of the State lying north of the line referred to.

*Rutledge v. Greater Greenville Sewer District,* 139 S. C. 188, 137 S. E. 597, sustained an issue of bonds by the commissioners of the district under a special law creating, as Greater Greenville Sewer District, the area embraced within two school districts in Greenville County. No issue under Article III, Section 34, of the Constitution was raised in that case. Moreover, it was decided prior to the enactment of the general law that is now Chapter 4 of Title 59 of the 1952 Code.

Respondents also cite, as authority for sustaining the act here under review, *State ex rel. Richards v. Moorer,* 152 S. C. 455, 150 S. E. 269, which was concerned with the

issuance of certificates of indebtedness under the State Highway Act of March 14, 1929. But the precise issue involved in the case at bar under Article III, Section 34, Subdivision IX, does not appear to have been raised in that case. Indeed in its only reference to Article III, Section 34 (152 S. C. at pages 486, 487, 150 S. E. at page 279), the court, dismissing as without merit the contention "that the provisions of the act creating highway districts are in conflict with section 5 of article 10 and section 34 of article 3 and other sections of the Constitution which recognize and adopt certain kinds of political subdivisions for purposes of local government", declared that the questions raised thereabout had been decided adversely to such contention in *Briggs v. Greenville County and Evans v. Beattie*. Incidentally, the constitutional amendment of February 18, 1905 (Const. Am. Art. II), to which reference was made in *Evans v. Beattie,* does not appear to have been discussed.

Nor was Article III, Section 34, Subdivision IX involved in *Alley v. Daniel,* 153 S. C. 217, 150 S. E. 691, where the act creating the Spartanburg Metropolitan District was upheld against the single contention that its title was insufficient under Article III, Section 17. Article III, Section 34, Subdivision IX, was not in issue in *Clarke v. South Carolina Public Service Authority,* 177 S. C. 427, 181 S. E. 481, or in *Benjamin v. Housing Authority of Darlington County,* 198 S. C. 79, 15 S. E. (2d) 737. And in *Floyd v. Parker Water and Sewer Subdistrict,* 203 S. C. 276, 17 S. E. (2d) 223, the only constitutional ground of attack was under Article X, Section 5. Also cited by respondents is *Ashmore v. Greater Greenville Sewer District,* 211 S. C. 77, 44 S. E. (2d) 88, 173 A. L. R. 397, which was concerned with an act providing for an auditorium and community center for the district, involved no contention under Article III, Section 34, Subdivision IX, and is not pertinent to the issue now before us.

In *Gaud v. Walker,* 214 S. C. 451, 53 S. E. (2d) 319, an act under which provision was made for the establishment of

the present "County Council" government of Charleston County was assailed on several constitutional grounds, among them that the provisions of the act constituted a special law in violation of Article III, Section 34, Subdivision IX. The court, upholding the act against this contention, cited *Lillard v. Melton,* 103 S. C. 10, 87 S. E. 421, to the effect that the constitution of 1895, unlike that of 1868, contained no provision establishing a uniform or definite form of county government; pointed out that the diversity of governmental policies among the several counties as evidenced by the statute relating to county government indicated an opinion on the part of the General Assembly that varying conditions in the respective counties precluded uniformity of treatment in relation to the administration of county affairs; declared, as had been said in *Carolina Grocery Company v. Burnet, supra,* that Article III, Section 34, Subdivisions IX and X were to be construed in the light of Article VII, Section 11; and held certain of the challenged provisions of the act valid under the power of the General Assembly to make special provision for municipal government. It struck down, as violative of Article III, Section 34, and Article VIII, Section 1, those provisions of the act that purported to empower the County Council "to 'enact reasonable ordinances and promulgate reasonable regulations for the preservation or promotion of public health, safety, and morals' ". Mr. Justice Oxner's discussion of that phase of the case is appropriate to the issue here involved. Speaking for a unanimous court, he said:

"We have just discussed rather fully the constitutional provisions relating to the government of cities and towns and the authority of the General Assembly to vest in them the police power. Respondents argue that the General Assembly may likewise vest the police power in counties. It is not necessary to determine on this appeal whether this may be done under a general statute. The precise question here is whether the police power may be delegated to the corporate authorities of one county and withheld as to all others. Ob-

viously, in view of Section 1, Article 8 of the Constitution, no such distinction could be made between towns and cities. We are not unmindful of the fact that this article does not apply to counties, but we think it may be properly considered in seeking a proper construction of the other sections of the Constitution. As pointed out in *Carroll v. Town of York, supra* (109 S. C. 1, 95 S. E. 121), one of the purposes sought to be accomplished by both Article 8, Section 1, and Article 3, Section 34, was 'to make uniform the statute law on like subjects'. We have heretofore endeavored to point out that rational differences exist in the various counties with reference to their fiscal affairs, but no good reason appears why the police power should be exercised by the corporate authorities of one county and not by the others; particularly when comparable in size and population. Our attention has been called to no condition peculiar to Charleston County calling for the exercise of the police power by its corporate authorities. There is nothing in the Act reasonably justifying this classification".

As to the requirement of reasonableness in classification under the police power, see also *Gasque v. Nates,* 191 S. C. 271, 2 S. E. (2d) 36.

*Sanders v. Greater Greenville Sewer District,* 211 S. C. 141, 44 S. E. (2d) 185, upheld a special act providing a method whereby an area lying without the limits of Greater Greenville Sewer District might become incorporated into that district and become a part of one of its subdistricts. The constitutionality of the act was challenged under the Fourteenth Amendment of the Constitution of the United States, and under several provisions of the Constitution of this State relating to elections, debt limitations and taxation; but no issue under Article III, Section 34, Subdivision IX was raised. The case is of interest here, nevertheless. The act involved in the *Sanders case* required as a condition precedent to the annexation the consent of a majority of the freeholders of the area to be so annexed, evidenced by their signatures on a written petition, or of a majority of the qual-

ified electors within said area in an election called for that purpose. The General Assembly thus recognized the propriety, to say the least, of giving to the freeholders or electors of the area the right to determine whether or not such area should be annexed. Such right is, as we have pointed out, given by the general law (Chapter 4 of Title 59 of the 1952 Code) to the landowners and qualified electors of any area in a county not included in any incorporated city or town. No reasonable basis for denying such right to the landowners or the qualified electors in the area of Una Water District appears in the record before us.

In *Welling v. Clinton-Newberry Natural Gas Authority,* 221 S. C. 417, 71 S. E. (2d) 7, it was contended that the act (XLVII Stat. at Large, p. 1958) creating, for the benefit of the towns of Clinton and Newberry, the Clinton-Newberry Natural Gas Authority for the purpose of constructing, operating and maintaining a single transmission line extending from Newberry through Clinton and thence to the main transmission line of Transcontinental Gas Pipe Line Company, was special legislation violative of Article III, Section 34, because of Chapter 187 of the 1942 Code (see Code, 1952, Sections 59-151 through 59-415). The court rejecting this contention, pointed out that the special act was required by the particular situation involved, as had been expressly recognized by the General Assembly at the time of its passage, and that the general act (Code, 1942, Section 9240; Code, 1952, Section 59-366) had contemplated that special situations might arise requiring such legislation. Apart from the fact that the general law with which we are concerned in the instant case was not involved in the *Welling case,* the factual situation in that case readily differentiates it from this.

*City of Spartanburg v. Blalock,* 223 S. C. 252, 75 S. E. (2d) 361, was a contest between the City Council of Spartanburg and the Commissioners of Public Works of that city as to whether the power of the commissioners to handle the fiscal affairs of the city waterworks system under the

act of March 2, 1896, as amended (then Sections 7280, 7281, 7283, 7284 and 7293 of the 1942 Code), a general law, had been taken away from them and vested in the city council under the act of May 8, 1933, as amended (then Chapter 187 of the 1942 Code), also a general law, pursuant to which the city had issued bonds secured by revenue derived from the waterworks system. The court, having held that the power of the commissioners to control and manage the city waterworks system and determine its fiscal policies had not been abridged by the latter act, proceeded then to consider the contention that Section 7675-53(3) of the 1942 Code, which authorized the commissioners (upon whom had been devolved the duties and powers of the former Commissioners of the Spartanburg Metropolitan District) to borrow, for the use of the city waterworks system, unemployed funds in their hands belonging to the Metropolitan District and pledge net revenues of the city system as security for the loan, was special legislation of the sort prohibited by Article III, Section 34 of the Constitution. Rejecting this contention, the court cited *State ex rel. Milford v. Brock,* 66 S. C. 357, 44 S. E. 931; *Burriss v. Brock,* 95 S. C. 104, 79 S. E. 193; *Brownlee v. Brock,* 107 S. C. 230, 92 S. E. 477; and *Sullivan v. City Council of Charleston,* 133 S. C. 156, 130 S. E. 872, as exemplifying the principle that such special legislation with regard to local fiscal affairs does not violate the constitutional mandate where a general law cannot be made applicable to the particular situation.

In *Brown v. Moseley,* 222 S. C. 1, 71 S. E. (2d) 591, attack was made, under Article III, Section 34, Subdivision IX, upon an act passed in 1952 amending the general law relating to the time for holding elections for the office of sheriff, so as to provide that in Kershaw County such election should be held in 1954 and quadrennially thereafter. It appeared that under the general law the election for sheriff in Kershaw County had been held in 1904 and quadrennially thereafter through 1916; that after the 1916 election, for a four-year term, a vacancy had occurred; that the appointee

to fill the vacancy had given up the office in 1918, and thereupon a sheriff had been elected in 1918 for a four-year term; and that quadrennial elections for that office had been held ever since, reckoning from 1918, although no statute to that effect had been enacted until the act of 1952. The court, upholding the act against the contention that it violated the constitutional injunction against special legislation, declared that the facts of the case (Kershaw County having been off the general schedule since 1918) clearly indicated the propriety of the challenged act as a special provision in the general law. It is to be noted that the act in question made no radical change in the general law pertaining to the office of sheriff; it merely changed the date from which the quadrennial elections should be reckoned.

*Wagener v. Johnson*, 223 S. C. 470, 76 S. E. (2d) 611, was concerned with an attack upon an act passed in 1953, empowering the Board of Township Commissioners of Folly Island to construct a waterworks system for said township and to issue revenue bonds to defray the cost thereof. Pertinent to consideration of this decision is its background, which we shall review as briefly as possible:

In 1936, pursuant to an act of the General Assembly approved on June 1 of that year (XXXIX Stat. at Large 1694; see Code, 1952, Sections 14-1261 through 14-1283) establishing a township form of government for Folly Island, a board of Township Commissioners had been elected; and such board had functioned thereafter pursuant to said act and subsequent amendments, being vested thereunder with powers similar to those devolved upon the town councils of incorporated towns of less than 1,000 inhabitants. In 1950 the general law relating to incorporation of such towns, which provided among other things that their corporate limits should extend no farther than one mile from the center of the town, was amended so as to exempt from this limitation any island the citizens of which might desire to incorporate it as a town. In 1951, following an election on the question of whether Folly Island should be incorporated as

a town under the name of "Folly Beach", a certificate of incorporation had been issued by the Secretary of State. A contest then ensued (*Wagener v. Smith,* 221 S. C. 438, 71 S. E. (2d) 1, 5) between the Board of Township Commissioners and the corporate authorities of the newly chartered Town of Folly Beach, the former contending that the town charter was invalid because the 1950 amendment, *supra,* violated Article VIII, Section 1 of the Constitution, and the latter asserting that the act establishing the township government of Folly Island was violative of Article VIII, Section 2 and was "special legislation of the sort prohibited by the Constitution". In that case the court held the 1950 amendment valid; declined to pass upon the validity of the act creating the township government, pending the result of a reference that had been ordered by the lower court to determine the number of electors residing and entitled to vote within the island at the time of the proposal to incorporate; and remanded the case for that purpose. Upon such remand it was found by the Master that a majority of said electors had not voted in favor of incorporation; and this finding was confirmed by a circuit decree, from which no appeal was taken. The case of *Wagener v. Smith* thus ended adversely to the proponents of incorporation. Prior to the commencement of the unsuccessful proceedings to incorporate as a town, the Board of Township Commissioners had obtained from Reconstruction Finance Corporation a commitment to purchase sufficient revenue bonds to finance the construction of a waterworks system, which had been blocked by the litigation just mentioned. *Wagener v. Johnson, supra,* was then brought, as a sequel to *Wagener v. Smith,* to lay the ghost of that case then haunting the contemplated bond issue, by setting at rest the question that had been noted but left undecided with regard to the constitutionality of the act establishing the township government.

While the particular constitutional provisions invoked in *Wagener v. Johnson* against the proposed issuance of bonds are not mentioned either in the opinion of this court or in

the decree of the lower court, examination of the transcript of record reveals that the only constitutional challenge contained in the pleadings was set forth in paragraph 4 of the complaint, which read as follows:

"4. That plaintiff is informed that the statutes establishing the Township of Folly Island, creating the Board of Township Commissioners, and vesting in said board the several functions enumerated in Code Sections 14-1261 to 14-1283, inclusive, are null and void for the reason that said statutes create a town or municipal corporation—notwithstanding that the same is designated by the nomenclature 'Township'—and are violative of the provisions of Sections 1 and 2 of Article VIII and Subdivisions II and IX of Section 34 of Article III, of the Constitution, which prohibit the organization of municipal corporations by special acts and do not permit the incorporation of a city or town without the consent of the majority of the electors residing and entitled by law to vote within the district proposed to be incorporated".

It is thus apparent that the issue with which we are presently concerned was not before the court in *Wagener v. Johnson,* and that the constitutional attack there was founded in reality upon Subdivision II of Section 34 of Article III, which forbids a special law incorporating towns, the contention being that the statutes in controversy created not a township, but a town. It is to be noted that the court expressly refrained from adjudicating the question of whether or not the statute creating the township (Code, 1952, Sections 14-1261 through 14-1283) was constitutional, resting its approval of the proposed bond issue upon the theory that this statute, together with the 1953 act (XLVIII Stat. at Large 781) empowering the Board of Township Commissioners to construct a waterworks system, should be construed as creating of the area a special district for waterworks purposes. In this connection it is to be observed:

1. That the general law relating to the establishment of water and sewer districts (Act of March 2, 1934, *supra;* Code, 1952, Title 59, Chapter 4) was in effect at the time of the passage in 1936 of the act creating the township government of Folly Island;

2. That the 1936 act (XXXIX Stat. at Large 1694) gave to the electors of the area in question the right, by their vote, to determine whether or not the "township" should be created and governed by a Board of Commissioners;

3. That the 1953 act in effect amended the 1936 act by giving to the already existting governing body the power to construct a waterworks system;

4. That the acts of 1936 and 1953, construed together as a "special district" act, made no radical departure from the essential principles of the general "water and sewer district" law; and

5. That the decision in *Wagener v. Johnson* thus accords with that in *City of Spartanburg v. Blalock, supra,* and the others before referred to, upholding, as "special provisions in general laws" (Const. Art. III, Sec. 34, Subd. X) local legislation that does not radically depart from the essential principles of existing general law on the subject.

The statement in the circuit decree quoted in the opinion, to the effect that legislation creating special purpose districts had been so often upheld that detailed discusssion of the issue was unnecessary, is not to be taken as implying that such legislation is immune from constitutional restraint.

The very purpose of Article III, Section 34 was to compel, so far as might be practicable, uniformity of statute law on like subjects, *Carroll v. Town of York,* 109 S. C. 1, 95 S. E. 121, *Owens v. Smith,* 216 S. C. 382, 58 S. E. (2d) 332, and thus to remedy "the great and growing evil of special and local legislation", *State v. Hammond,* 66 S. C. 219, 44 S. E. 797, 799. In the light of that purpose, the following principles are fairly deducible from consideration of the many decisions of this court under Subdivisions IX and X of that Section:

1. In the absence of a general law on the subject, a special law affecting a particular locality alone will not be within the prohibition of Subdivision IX if it may reasonably be concluded that a general law cannot be made applicable to the local situation;

2. If it may reasonably be concluded that existing general law on the subject cannot be made applicable to the local situation, a special law for the particular locality will not be within the prohibition of Subdivision IX; and

3. If there be a general law on the subject that can be made applicable to the local situation, but local conditions afford rational basis for enactment of a special law affecting that locality alone, such special law, if it does not radically depart from the essential principles of the general law, will be upheld, under Subdivision X, as a special provision in such general law.

But where no reasonable basis appears justifying the conclusion that a general law cannot be made applicable, the clear mandate of Subdivision IX requires that the special act be declared invalid. Nor can a special act that radically departs from the essential principles of applicable general law be spared such fate under Subdivision X on the theory that it is a "special provision" in such law. Cf. *Town of Forest Acres v. Town of Forest Lake, supra.* Subdivisions IX and X of Article III, Section 34 must be construed together, and not in such fashion that the provisions of either will be nullified by those of the other. *State ex rel. Schroder v. Burns, supra.*

I am unable to agree with the suggestion that the act *sub judice* may be sustained perforce Article VII, Section 11 of the Constitution, whereby the General Assembly "may provide such system of township government as it shall think proper in any and all the Counties, and may make special provision for municipal government * * *". The holding in *Carolina Grocery Company v. Burnet, supra,* that the term "municipal" as used in Article VII, Section 11, included counties as well as incorporated cities, towns and villages,

was based upon the fact that Article VII is entitled "Counties and County Government". But assuming the applicability of Article VII, Section 11, to the case in hand— a question that we need not and do not decide—the provisions of that Section must be construed in connection with those of Article III, Section 34, Subdivision IX. Cf. *Carolina Grocery Company v. Burnet, supra.* Special legislation violative of the latter is not authorized by the former. *Owens v. Smith, supra.* Cf. also *Thomas v. Macklen,* 186 S. C. 290, 195 S. E. 539, and *Town of Forest Acres v. Town of Forest Lake, supra.*

"The Legislature may classify, for the purpose of legislation, if some intrinsic reason exists why the law should operate upon some and not upon all, or should affect some differently from others, but this classification must be based upon differences which are either defined by the Constitution, or are natural or intrinsic, and which suggest a reason that may rationally be held to justify the diversity in the legislation. It must not be arbitrary, for the mere purpose of classification. The class must be characterized by some substantial qualities or attributes, which render such legislation necessary or appropriate for the individuals of the class". *Sirrine v. State,* 132 S. C. 241, 128 S. E. 172, 175.

To the same effect are *Sansing v. Cherokee County Tourist Camp Board,* 195 S. C. 7, 10 S. E. (2d) 157; *Gillespie v. Pickens County,* 197 S. C. 217, 14 S. E. (2d) 900; *Shillito v. City of Spartanburg,* 214 S. C. 11, 51 S. E. (2d) 95, 5 A. L. R. (2d) 863; and *Fordham v. Fordham,* 223 S. C. 401, 76 S. E. (2d) 299.

Respondents point out that under the general law (Code, 1952, Title 59, Chapter 4) the commissioners of water and sewer districts are given no powers with regard to the collection and disposal of garbage. But that fact is of no consequence here; such power may be granted by way of amendment of the code provisions.

There is no merit in respondents' suggestion that Article III, Section 34, Subdivision IX does not apply to legislation

relating to special purpose districts. The language of the constitutional mandate is simple and unambiguous, prohibiting enactment of special laws in all cases where a general law can be made applicable. To read into it the suggested exemption would be to amend, not interpret, it.

Nor can the 1955 act be sustained as a special provision in the general law. To construe Article III, Section 34, Subdivision X as sanctioning a local act so radically and essentially different from the applicable general law is effectually to nullify the prohibition contained in Subdivision IX.

The leading opinion suggests that, so far as the record discloses, no effort has been made by the landowners and electors of the area to create a special purpose district under Chapter 4 of Title 59 of the 1952 Code, and that this non-action justified the General Assembly in asserting its inherent right to correct the unsanitary conditions prevailing within this territory. It is true that as to whether effort has or has not been made pursuant to Chapter 4 of Title 59 the record is silent. But nowhere in the 1955 act is such non-action recited or suggested in justification of its enactment. Moreover, assuming that the landowners and electors of the area have made no effort in that direction or, having tried, have failed in such effort, it would by no means follow that either event would justify the enactment of the special law now before us. By what process of reasoning can it be argued that failure of the landowners and electors to act shall warrant their being penalized by not being allowed to elect their commissioners or to be heard concerning the water rates and the charges for the use of sewage facilities? Nor does it seem to me that the pendency of proceedings to create of the area a subdistrict of Spartanburg Metropolitan District under the provisions of the 1929 act could justify the passage of such an act as is here involved. Certainly the act before us contains no such recital. Further, it seems to me that by the enactment of Chapter 4 of Title 59 the General Assembly intended to leave it to the landowners and electors of the area concerned to say by their vote whether

or not such a district should be created. And if, in the opinion of the General Assembly, it is desirable to compel the establishment of public water and sewage facilities in areas in which the inhabitants have failed or refused to act under Chapter 4 of Title 59, why cannot a general law applicable to such case be enacted?

I cannot escape the conclusion that the act of May 19, 1955, is special legislation within the prohibition of Article III, Section 34, Subdivision IX. The General Assembly, by enacting Chapter 4 of Title 59, has declared in effect that a general law can be made applicable to the creation of water and sewer districts in any community not incorporated as a town or city. I find in the record nothing that would afford reasonable basis for holding that conditions in the Una Water District area require special legislation such as is here involved. The applicability of the constitutional inhibition in such cases cannot be doubted. Cf. *Gillespie v. Blackwell,* 164 S. C. 115, 161 S. E. 869; *Salley v. McCoy,* 182 S. C. 249, 189 S. E. 196; *Webster v. Williams,* 183 S. C. 368, 191 S. E. 51, 111 A. L. R. 1348.

I am no less firmly convinced that the issue under the due process clauses should be resolved in favor of the appellants, although the limitation upon the power of the General Assembly imposed by these provisions is less susceptible of exact definition than that under Article III, Section 34.

Money raised by general taxation may constitutionally be applied to purposes from which the individual taxpayer may receive no benefit, or indeed, may suffer serious detriment; but assessments for public improvements laid upon particular property owners are ordinarily constitutional only if based upon benefits received or reasonably to be expected. *Nashville, C. & St. L. R. Co. v. Walters,* 294 U. S. 405, 55 S. Ct. 486, 79 L. Ed. 949. Such benefits need not be direct or immediate; they may be indirect, such as might reasonably be expected to accrue as the result of the general benefits to the surrounding territory. *Myles Salt Co. v. Board of Commissioners,* 239 U. S. 478, 36 S. Ct. 204, 60 L. Ed.

329. And it is well settled that a legislative finding that the public works will be of benefit to the property owners concerned need not be expressed, but is to be implied from the particularity of the description, in the statute, of the district itself; and that such finding, express or implied, is entitled to great deference and is conclusive unless shown to be without reasonable foundation. *Chesebro v. Los Angeles County Flood Control District,* 306 U. S. 459, 59 S. Ct. 622, 83 L. Ed. 921. But, for the same reason that findings by the legislature that concern the limitation of its power under Article III, Section 34 are, and must be, subject to review by the courts, determination of the factual issue of whether or not there was reasonable basis for the finding that the property of the aggrieved taxpayer will be benefited by the proposed public works is ultimately a judicial matter where the due process clause is invoked.

The facts in the instant case have already been stated. It appears undisputed that the textile plants and mill villages of the appellants Mills Mill, Draper Corporation and Powell Knitting Company, which are in that portion of the Una Water District area lying south of the main line of the Southern Railway, are adequately served by water systems installed by these appellants; that those systems are already connected with the Spartanburg waterworks system, from which they obtain their supply of water; that of the other residences in the southern half of the proposed district all but twenty-four are now adequately served by the Spartanburg waterworks system; that no problem of health or sanitation exists in this part of the district; that water supply and sewage disposal facilities are inadequate in only a small area (the Una and Johnson City communities) in the northern part of the district; and that the properties of the three appellants before mentioned, which have no need for the proposed "publicly operated water and sewer systems", have an assessed valuation, for tax purposes, of about one-third of the total assessment of all properties in the proposed district. If under the provisions of the act the commissioners

should see fit to acquire the water or sewer systems of these appellants, the appellants would themselves pay, in taxes, one-third of the compensation due them in the transaction. If such systems should not be so acquired, appellants may effectually be deprived of their value without compensation, for Subsection 6 of Section 3 of the act empowers the commissioners to "prescribe regulations requiring persons who shall be residents of the district to make use of any water or sewer system which the district shall place in operation".

I confess my inability to perceive, in this situation, any reasonable prospect of benefit to the appellants' properties. On the contrary, it seems obvious to me that inclusion, in the proposed district, of the area lying south of the Southern Railway main line was for the benefit not of that area, but of the two small communities north of the railroad, to which reference has been made. *Myles Salt Co. v. Board of Commissioners, supra,* was decided on the pleadings, and the act there involved was one creating a drainage district; but the following language of the opinion in that case is applicable here [239 U. S. 506, 36 S. Ct. 206] :

"It is to be remembered that a drainage district has the special purpose of the improvement of particular property, and when it is so formed to include property which is not and cannot be benefited directly or indirectly, including it only that it may pay for the benefit to other property, there is an abuse of power and an act of confiscation. *Phillip Wagner v. Leser, supra* (239 U. S. 207, 36 S. Ct. 66, 60 L. Ed. 230). We are not dealing with motives alone, but as well with their resultant action; we are not dealing with disputable grounds of discretion or disputable degrees of benefit, but with an exercise of power determined by considerations not of the improvement of plaintiff's property, but solely of the improvement of the property of others—power, therefore, arbitrarily exerted, imposing a burden without a compensating advantage of any kind."

I would reverse the judgment of the circuit court.

G. DUNCAN BELLINGER, Acting Associate Justice, concurs.